SUN SHIP, INC., Plaintiff,

and

General Dynamics Corporation, Quincy Shipbuilding Division, Intervenor-Plaintiff,

v.

R. James WOOLSEY et al., Defendants,

and

National Steel and Shipbuilding Company, Intervenor-Defendant.

Civ. A. No. 79–2734.

United States District Court, District of Columbia.

Nov. 20, 1979.

Gerald P. Norton, Gilbert E. Geldon, Murray J. Belman, Pepper, Hamilton & Scheetz, Inc., Washington, D. C., for plaintiff, Sun Ship, Inc.

Herbert L. Fenster, E. Sanderson Hoe, Harvey G. Sherzer, Sellers, Conner & Cuneo, Washington, D. C., for intervenor-plaintiff, General Dynamics Corp., Quincy Shipbuilding Div.

Carl S. Rauh, U. S. Atty., Washington, D. C., Royce C. Lamberth, Asst. U. S. Atty., Mark N. Mutterperl, Dept. of Justice, Civ. Div., Kenneth Raisler, Asst. U. S. Atty., Washington, D. C., for government defendants; Allan Freidson, Edward Houry, Naval Sea Systems Command, Washington, D. C., of counsel.

Michael L. Burack, John H. Pickering, David M. Becker, Seth A. Davidson, Marie N. Doland, Wilmer & Pickering, Washington, D. C., for intervenor-defendant, National Steel and Shipbuilding Co.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

### I. INTRODUCTION

This action arises from a complaint for declaratory and injunctive relief under 28 U.S.C. §§ 1331, 1332, 1361, and 2201, et seq., and the Administrative Procedure Act, 5 U.S.C. § 701 et seq. The complaint was filed on October 15, 1979.

Plaintiff, Sun Ship, Inc., ("Sun Ship"), is a Delaware corporation having its principal place of business in Chester, Pennsylvania, and is engaged primarily in the business of building and repairing ships. The defendants are the Acting Secretary of the Navy,[1] several subordinate Navy officials, and the United States (collectively referred to as "the Navy").

The complaint, as amended on October 19, 1979, seeks a judgment (1) declaring that the Navy unlawfully awarded a contract for the detailed design and construction of a cable repair ship called the "T-ARC 7" to National Steel and Shipbuilding Co. ("NASSCO"), in violation of the Armed Services Procurement Act of 1947, as amended, 10 U.S.C. § 2301 et seq., and Defense Acquisition Regulations ("DAR") promulgated thereunder 32 C.F.R. § 1 et seq., (2) requiring the Navy to terminate the contract, and (3) ordering the Navy to award the contract to Sun Ship. In addi-

tion to its complaint, Sun Ship filed motions for a temporary restraining order and a preliminary injunction.

At the hearing on plaintiff's motion for a temporary restraining order, held October 17, 1979 the Court granted leave to NASSCO to intervene as a defendant. After hearing argument of the parties, the Court denied plaintiff's motion.

On November 8, 1979, the Court granted leave to intervene as a plaintiff to General Dynamics Corporation, Quincy Shipbuilding Division ("QSD"), another company that had submitted a proposal for the T-ARC 7 contract. Although QSD has joined the motion for a preliminary injunction, QSD only seeks to have the NASSCO contract declared illegal and an order directing reprocurement.

A hearing on the motion for a preliminary injunction was held on November 9, 1979, at which time the Court heard from all parties. Thus, this case is now before the Court on the motion of Sun Ship and QSD for a preliminary injunction. For the reasons more fully set forth below, the Court denies the motion. The Court will first set forth background information which is relevant to its decision. The Court will then address the issues at bar. Accordingly, pursuant to Fed.R.Civ.P. 52, the following constitutes the Court's findings of fact and conclusions of law.

### II. BACKGROUND

This action was commenced by Sun Ship, and later joined in by QSD, to enjoin performance of a Navy contract to design and construct an ocean-going vessel which has a target cost in excess of one hundred million dollars. This ship, designated the "T-ARC 7", is to be used for retrieving, repairing and deploying cable on the bottom of the ocean. These cables are part of a major Naval intelligence-gathering network whose function is classified and essential to the national defense. The T-ARC 7 is to be

---

1. Since the filing of Sun Ship's action on October 15, 1979, Mr. Woolsey has been succeeded by Edward Hidalgo, Secretary of the Navy, who should be deemed substituted as a party by virtue of Fed.R.Civ.P. 25(d)(1).

a technological vessel, with sophisticated and complex electrical and mechanical systems. The Navy's existing cable ships are more than thirty years old and do not have the capability to perform the functions envisioned for the T–ARC 7. Due to the inadequacy of the Navy's present cable ships and the T–ARC 7's projected role in aid of monitoring the continued improvement in the operational capabilities of potential opposing naval forces, the Navy has concluded that it is essential to the national defense that the T–ARC 7 be placed in service when projected.

On July 31, 1978, the Navy held a pre-solicitation briefing for prospective offerors in connection with the T–ARC 7 contract.[2] The purpose of the briefing was to facilitate full and free competition for the project by furnishing prospective offerors with information to assist them in preparing proposals.

On December 29, 1978, the Navy released a "Request For Proposals" ("RFP") for a negotiated cost-plus-incentive-fee contract for the design and construction of the T–ARC 7.[3] Such a contract "provides for payment to the contractor of allowable costs incurred in the performance of the contract, to the extent prescribed by the contract." 32 C.F.R. § 3–405.1(a) (1976). Furthermore, such a contract:

> . . . is suitable for use only when the uncertainties involved in contract performance are of such magnitude that cost of performance cannot be estimated with sufficient reasonableness to permit the use of any type of fixed-price contract.

32 C.F.R. § 3–405.1(b) (1976). Here, the Navy used a negotiated procurement because of the uniqueness of the T–ARC 7 and the uncertainties involved with its de-

sign and manufacture. The RFP provided for an incentive fee based on actual costs, but also specified the level of the fee. The target fee was to be 9% of the target costs, and would increase or decrease at a specified rate if the actual costs were less than or greater than the target cost. The RFP required offerors to submit both Technical/Management and Cost proposals for the T–ARC 7. The Technical/Management Proposals were to be submitted on or before March 1, 1979, and the Cost Proposals were to be submitted on or before April 5, 1979.

Accordingly, on March 1, 1979, six offerors, including Sun Ship, NASSCO and QSD, submitted Technical/Management Proposals in response to the RFP. These proposals were to be reviewed pursuant to the procedure established in the Source Selection Plan ("SSP") adopted by the Navy on November 22, 1978. *See* Jt.Ex.D.[4] The SSP provided for an evaluation and decision process consisting of three levels. The Secretary of the Navy appointed Vice Admiral C. R. Bryan, Commander, Naval Sea Systems Command, as the Source Selection Authority (SSA). Under Department of Defense Directive 4105.62 (January, 1976), the SSA has full responsibility and final authority to select the source for award of the contract. Among other duties and responsibilities of the SSA, the Source Selection Plan indicates that he was to appoint a pre-award survey team, and request and direct necessary audits and cost analysis. Jt.Ex.D. p. 4–1. The Navy conducted pre-award surveys at the facilities of all offerors. Jt.Ex.V, p. 2. In addition, the Navy utilized the resources of the Defense Contract Audit Agency which conducted audits at the facilities of all offerors.

**2.** Pre-solicitation procedures, including conferences, are authorized by 32 C.F.R. § 3–106 (1976).

**3.** There are two types of Government procurement. Procurement by formal advertisement is used whenever "feasible and practicable." 10 U.S.C. § 2304(a) (1976); 32 C.F.R. § 2–102.1(a) (1976). This procedure is generally used when the government can define its requirements precisely. The other type of procurement, by

negotiation, may be used for a variety of reasons. 32 C.F.R. § 3–201 *et seq.* In a negotiated procurement, as in the instant case, the solicitation of offers by the procuring agency is accomplished through the issuance of a "Request For Proposals."

**4.** "Jt.Ex." indicates reference to the *JOINT EXHIBITS OF DEFENDANTS AND INTERVENOR–DEFENDANT,* filed November 2, 1979.

Admiral Bryan appointed a Source Selection Advisory Council (SSAC) consisting of five members and supported by counsel and the authorized Contracting Officer. The SSAC functions as a staff and principal advisor of the SSA. The SSAC, in turn, appointed a Source Selection Evaluation Board (SSEB) consisting of six members and supported by a team of twenty-two evaluators including engineering, contracting, technical and management personnel. The SSEB was to analyze and evaluate the proposals in all categories,[5] except "Cost Realism", to determine the need for clarification of, or the existence of deficiencies in, the proposals. The SSEB also was to prepare evaluation narratives, perform criteria scoring, and submit the results of its analysis to the SSAC. Thus, the proposals underwent a three-level independent and in-depth review and decision process conducted by Navy personnel. In addition, a "Cost Realism Team", under the supervision of the Contracting Officer, evaluated the cost realism of the proposals in detail.

During its preliminary evaluation of the Technical/Management Proposals, the SSEB determined that additional information was needed to clarify specific areas of each proposal. *See* Jt.Ex.V. p. 4. Accordingly, on March 8, 1979, the Contracting Officer notified each offeror by letter that the necessary items of information should be submitted by March 15, 1979. *See* Jt. Exs.E–J. The Navy used the same transmittal letter text for each letter, although the information requested of the specific offeror varied. The information requested dealt primarily with such matters as resumes of key personnel and certain labor and man-day estimates. Each of the offerors supplied the requested information by return letter. *See* Jt.Exs.K–P. There is no dispute that the SSEB relied on the requested information in its evaluation of the offerors' proposals.

When the Technical/Management Proposals were submitted, the SSEB assigned two evaluators to each of the sixty-nine elements into which the proposals were divided. Each evaluator, working separately, reviewed the proposals and evaluated them with respect to those elements assigned to him for review. The evaluator determined scores for each element on a scale ranging, in increments of 20, from 0 to 100. *See* Jt.Ex.D, p. 7–8. Each evaluator also prepared a narrative explaining each score. Jt.Ex.Q.

The SSEB reviewed the scores given by the evaluators for the various elements, reconciled differences between the evaluators' scores, and adjusted scores it deemed incorrect. The SSEB also prepared a narrative describing the composite scores, and explaining, as to each element reviewed, the adjustments and reconciliations. *See* Jt. Ex.Q. Finally, the SSEB prepared an Evaluation Report on the Technical/Management Proposals for the SSAC. *See* Jt.Ex.R. This report was issued on April 25, 1979, and the results of the SSEB's evaluations were presented to the SSAC on May 2–4, 1979. *See* Jt.Ex.V, p. 4.

The Cost Realism Team began its review upon submission of the Cost Proposals on April 5, 1979. In developing its evaluation:

[t]he Cost Realism team worked primarily from the data furnished by the offerors in their Cost and Technical/Management proposals, supplemented by data from recent and on-going audits, information available within the Command, and interviews with all offerors.

Jt.Ex.S, p. 1. The "interviews with all the offerors" referred to were the Cost Realism Conferences, which took place shortly after the Cost Proposals were submitted. The purpose of the conferences was to allow the Cost Realism Team to obtain information concerning the methods by which the offerors had arrived at their proposals.

The Cost Realism Team evaluated the proposals and on May 7, 1979, submitted its "Cost Realism Report on T–ARC Proposals" to the SSAC. Jt.Ex.S. On May 29, 1979,

---

**5.** Each proposal was broken down into nineteen subcategories. These subcategories, in turn, were divided into specific elements.

Thus, each proposal consisted of sixty-nine elements which comprised nineteen subcategories.

the Chairman of the SSAC directed the Cost Realism Team to expand its evaluation in order to "develop for each offeror the most accurate estimate of the total contract cost exposure to the Government". Jt. Ex.T. Accordingly, on June 6, 1979, the Cost Realism Team submitted an "Addendum" to the SSAC. Jt.Ex.U. In the Addendum, the Team re-examined its initial assessments of the proposals submitted by NASSCO, Sun Ship, and a third offeror, and provided a revised estimate of the Government cost exposure for each.

As originally submitted, NASSCO's cost proposal was $107,153,000, and Sun Ship's was $103,851,000. Jt.Ex.V, p. 41. The Cost Realism Team adjusted these proposed costs in light of its review and evaluation of the proposals. In its May 7, 1979 Report, the Cost Realism Team adjusted NASSCO's estimated cost to $125,605,000, and Sun Ship's estimated cost to $119,736,000. Jt.Ex.S, pp. 34, 41. As directed by the SSAC, the Cost Realism Team subsequently refined these estimates as reflected in its June 6, 1979 Addendum to the Cost Realism Report. The refined estimated costs were $121,434,000 for NASSCO and $116,323,000 for Sun Ship. Jt.Ex.U, p. 2. Thus, the estimated cost for Sun Ship, set forth in the June 6, 1979 Addendum, was $5.1 million lower than the estimated cost for NASSCO.

In addition to the foregoing estimates, the Addendum contained a number of "ranges"—that is, dollar spreads surrounding each estimate. The ranges set forth in the Cost Realism Team's chart captioned "Price Summary" are as follows:

| | Range |
|---|---|
| 1) Sun Ship | $110,507,000 – $122,319,000 |
| 2) NASSCO | $115,362,000 – $127,508,000 |

Jt.Ex.U, p. 2. As can be seen, the estimates ranges for NASSCO and Sun Ship overlap from $115,362,000 to $122,319,000.

At present, the record does not disclose exactly what occurred in regard to QSD's cost proposal. However, it appears that QSD submitted the lowest cost proposal to the Navy, at a target price of $97,725,000. QSD was advised after the contract award that the Navy had determined this figure to be unrealistically low by approximately $20,000,000.

The SSAC reviewed, and performed its own evaluation of the findings of the SSEB and the Cost Realism Team. It then made a final evaluation of the proposals and, on June 29, 1979, unanimously recommended to the Source Selection Authority that the contract be awarded to NASSCO. Jt.Ex.V.

The reasoning underlying the SSAC's recommendation to award the contract to NASSCO is set forth in detail in the SSAC's "Proposal Analysis Report". *Id.* After reviewing and evaluating the SSEB report, the SSAC found that three of the Technical/Management Proposals—those of NASSCO, Sun Ship and a third offeror—were superior to the others. QSD's Technical/Management Proposal was ranked lowest among all proposals. The proposals of NASSCO and Sun Ship were slightly superior to that of the third offeror. Between NASSCO and Sun Ship, NASSCO scored higher than Sun Ship in eight of the evaluation subcategories, Sun Ship scored higher than NASSCO in five subcategories, and NASSCO and Sun Ship received equal scores in the remaining seven subcategories. The SSAC gave NASSCO a slightly higher overall numerical score (74.7) than Sun Ship (74.4).[6] Nevertheless, the SSAC determining that the NASSCO and Sun Ship Technical/Management Proposals were "essentially equal". *Id.*, p. 40.

The SSAC's reasoning, supporting its evaluation of the Cost Proposals, is set forth in the following excerpt from its Report:

Using the resources of the NAVSEA Ship Cost Estimating Group, the Defense Contract Audit Agency, and the Field Pricing Reports submitted by the cognizant Supervisors of Shipbuilding in the field, the Cost Realism Team developed individual estimates for each shipbuilder.

---

**6.** QSD's numerical score is not before the Court. However, it appears that QSD's score was below that of Sun Ship's and NASSCO's.

Because the Request for Proposals had stated that the element of cost would become increasingly important if the technical proposals became very close, the SSAC had a number of briefings by the Cost Realism Team. Because of the close competitive scoring of NASSCO and SUN, the SSAC required the Cost Realism Team to perform more extensive analysis of the likely cost outcome of those offering the three top technical proposals. The final results are then as follows:

| | Government Estimate | Contractor Proposals |
|---|---|---|
| SUN | $116.323M | $102.851M |
| NASSCO | $121.434M | $107.153M |

. . . The variance in the final estimate between SUN and NASSCO is about five million dollars or slightly over four percent. Recognizing that this small variance is based on estimates that carry the weight of uncertainty in predicting the cost outcome over the design and building period of the T–ARC, and since the resultant contract is a cost type in recognition of this uncertainty, the four percent difference in estimates is not of a significant magnitude to ensure that an award to SUN would ultimately result in least cost to the Government. It is the judgment of the Source Selection Advisory Council, therefore, that these factors result in a conclusion that the estimated difference in cost between the two low offerors is not a significant enough basis upon which to determine a successful offeror. Therefore, on total estimated cost, as well as technical criteria, SUN and NASSCO are deemed to be essentially equal.

Jt.Ex.V, pp. 40–41.

Due to the finding by the SSAC that NASSCO's and Sun Ship's proposals were essentially equal in both Technical/Management and Cost criteria, the SSAC evaluated a number of other factors that it determined "would bear on execution of this program, or that might otherwise have positive or negative effects upon other Navy programs." Jt.Ex.V, p. 42. These factors have been referred to as the "tie breakers." The tie breakers utilized by the Navy were as follows: [7]

1) "impact of the T–ARC 7 program on overhead rates of other Navy programs,"

2) "contract administration office,"

3) "contribution to other Navy programs,"

4) "workload fit," and

5) "industrial and competitive base."

See Jt.Ex.V, p. 2. These tie breakers admittedly were adopted by the SSAC without discussion of them with Sun Ship or NASSCO.

On the basis of these factors, the SSAC concluded that it was clear that:

. . . . award to [NASSCO] carried the advantages of contract administration, workload fit, contribution to other Navy programs and impact on overhead rates; advantages that would not be found in any award to [Sun Ship]. Award to [Sun Ship] had the advantage of expanding the competitive base.

Id., p. 45. Accordingly, "based on the foregoing," the SSAC recommended that the contract be awarded to NASSCO. Id.

The Source Selection Authority (SSA), Admiral Bryan, made an independent review of the 45-page SSAC Report, signed it, and made the notation on the cover page that it was "Returned Approved." Id., p. 1.

### III. DISCUSSION

█ The Court of Appeals for this circuit has set forth the following four criteria to govern the issuance of a preliminary injunction: (1) the probability of plaintiff's success on the merits; (2) irreparable injury to the plaintiff absent injunctive relief; (3) harm to other interested parties if injunctive relief were granted; and (4) the effect of the injunction on the public interest. *Virginia Petroleum Jobbers Association v.*

---

**7.** In addition to the tie breakers listed, the Navy also determined that both NASSCO and Sun Ship were located in labor surplus areas and that neither was a small business. Jt.Ex.V, p. 45.

*FPC,* 104 U.S.App.D.C. 106, 110, 259 F.2d 921, 925 (D.C. Cir. 1958). The first criteria listed above, the probability of plaintiff's success on the merits, may vary according to the Court's assessment of the remaining three criteria. When confronted with a case in which the other three criteria strongly favor injunctive relief, an injunction will issue if the plaintiff has made a "substantial case on the merits.", *Washington Metro-Area Transit Comm'n v. Holiday Tours, Inc.,* 182 U.S.App.D.C. 220, 222, 559 F.2d 841, 843 (D.C. Cir. 1977). In its analysis of the above criteria, the Court must balance the equities and avoid any "wooden" rules in its determination whether an injunction is appropriate. *Id.* 182 U.S.App.D.C. at 223, 559 F.2d at 844.

A. *"Sun Ship" and QSD Will Not Suffer Irreparable Injury Absent Injunctive Relief.*

▮▮▮ A major purpose in granting injunctive relief is to maintain the status quo pending a final determination of the merits of the plaintiff's claim by the Court. *Id.* 182 U.S.App.D.C. at 223, 559 F.2d at 844. The status quo of this case is that the T–ARC 7 contract has been awarded to NASSCO and performance has begun. The T–ARC 7 contract is to be performed by NASSCO over a forty-month period. NASSCO and the Navy have indicated that no significant expenditures in performance of the contract are likely to occur within the next month. The Court's power to set aside the T–ARC 7 contract, if appropriate, will not be diminished during that period of time. Plaintiff Sun Ship and intervenor-plaintiff QSD simply have not satisfied this Court that they will suffer irreparable injury before a final determination of the merits of their claims. Therefore, the Court finds that plaintiff and intervenor-plaintiff will not suffer irreparable injury absent injunctive relief at this time.

B. *Other Interested Parties Would be Harmed If Injunctive Relief Were Granted.*

As already indicated, performance has begun on the T–ARC 7 contract. If a preliminary injunction were to issue, even for a relatively short period of time, construction and completion of the T–ARC 7 could be substantially delayed as a result of rescheduling difficulties that NASSCO and its subcontractors would encounter. Moreover, such delay would impose a substantial cost penalty on the government. Furthermore, if all work were stopped on the T–ARC 7 contract and later resumed, construction and delivery to the Navy would likely be delayed considerably longer than the period of initial stoppage.

NASSCO would also incur substantial costs as a result of any such delay. These costs would result from (1) increased overhead charges resulting from stoppage of work on the T–ARC 7; (2) impairment of NASSCO's ability to reschedule existing work; and (3) impairment of NASSCO's ability to seek and take on new business. According to NASSCO, such impediments to NASSCO's ability to effectively conduct its business have already arisen as a result of the pendency of this action. Therefore, the Court finds that the Government, NASSCO and third parties would suffer harm if the injunctive relief requested were granted.

C. *Consideration of the Public Interest Indicates the Requested Injunctive Relief is Inappropriate.*

The public has an interest in both securing the national defense and preventing unnecessary costs to the Government. As already indicated, if a preliminary injunction were to issue, the resulting delay in performance of the T–ARC 7 contract would impose a substantial cost penalty on the Government. Furthermore, the requested injunctive relief would jeopardize the projected service date of the T–ARC 7. As indicated, the Navy considers it essential to the national defense that the T–ARC 7 be placed in service when originally projected. Therefore, the Court finds that the public interest does not warrant issuance of the extraordinary relief requested by plaintiff and intervenor-plaintiff.

D. *Sun Ship and QSD Have Not Established a Sufficiently Strong Probability of Success on the Merits.*

Plaintiff presents three basic arguments challenging the Navy's decisions regarding the award of the T–ARC 7 contract. First, Sun Ship argues that the Navy was obliged to award the contract to Sun Ship because its proposal was technically equal to NASSCO's and was projected by the Navy to cost $5.1 million dollars less. Second, Sun Ship contends that even if the Navy properly declared a "tie" between Sun Ship's and NASSCO's Technical/Management and Cost Proposals, it exceeded its legal authority and acted irrationally not only in its selection and application of the "tie breaker" factors, but also in making a decision without affording an opportunity for discussions and best and final offers. Finally, Sun Ship submits that the Navy was required by statute and regulation to afford all offerors within the competitive range an opportunity for (1) meaningful discussions, and (2) best and final offers. QSD joins only the last of these contentions, arguing that the procurement process should be started anew. In contrast, Sun Ship contends that it should be awarded the T–ARC 7 contract.

 A reviewing Court may not overturn a procurement decision by a Government agency unless the party challenging the decision overcomes the "heavy burden of showing either that (1) the procurement official's decisions on matters committed primarily to his own discretion had no rational basis, or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations." *Kentron Hawaii, Ltd. v. Warner,* 156 U.S. App.D.C. 274, 277, 480 F.2d 1166, 1169 (D.C. Cir. 1973) (footnote omitted). The Court is not satisfied that Sun Ship and/or QSD have shown either at this time.

First, as stated above, Sun Ship argues that it should have been awarded the contract because it was the low cost bidder. However, in several different sections, the RFP warned all offerors that the Government would not necessarily award the con-

tract to the firm who proposed the lowest target cost. *See* Jt.Ex.B, pp. 15 and 46. Further, the Defense Acquisition Regulations also indicate that cost should not be considered controlling in cost-reimbursement-type contracts. See 32 C.F.R. § 3–803(c) (1976). Finally, it is not clear that it was irrational for the Navy to conclude that Sun Ship's and NASSCO's Cost Proposals were essentially equal, in light of the uncertainties inherent in predicting the costs of a unique and technological ship such as the T–ARC 7.

Second, as stated above, Sun Ship argues that the Navy's application of the "tie breaker" criteria was both irrational and illegal. However, the RFP suggested the possibility that the Navy may use additional criteria in the event of a tie in assessment of the proposals. *See* Jt.Ex.B, p. 15. In addition, there is some authority that a procuring agency has the discretion to select and apply additional criteria, whether or not explicitly set forth in the RFP, in order to choose between two equally qualified proposals. *See General Electric Co. v. Kreps,* 456 F.Supp. 468, 473 (D.D.C.1978); *In the Matter of Group Hospital Service, Inc.,* 58 Comp.Gen. 263, 270 (1979). Finally, it is not clear that the tie breaker criteria applied by the Navy was not rationally related to its goal of obtaining the contract that will be the most advantageous to the Government, all factors considered. *See* Jt. Ex.B, p. 46; 32 C.F.R. § 3–801.1 (1976).

Ultimately, as indicated above, Sun Ship and QSD argue that the Navy was required by statute and regulations to conduct meaningful discussions and afford an opportunity for best and final offers from all offerors within the competitive range. However, the RFP specifically notified all offerors of the possibility that award might be made without discussion, and requested each offeror to submit its most favorable proposal. Jt.Ex.B, p. 15. While the Armed Services Procurement Act of 1947, as amended, 10 U.S.C. § 2304(g) and Defense Acquisition Regulation 3–805.1, 32 C.F.R. 3–805.1, require written or oral discussion in negotiated procurements, the Navy relies on an

exception thereto. That exception provides that no discussions are required where:

> . . . it can be clearly demonstrated from the existence of adequate competition or accurate prior cost experience with the product or service that acceptance of the most favorable initial proposal without discussion would result in a fair and reasonable price, provided however that the solicitation notified all offerors of the possibility that award might be made without discussion, and provided that such award is in fact made without any written or oral discussion with any offeror.

32 C.F.R. § 3–805.1. Thus, it is the Navy's interpretation that its action concerning the T–ARC 7 contract falls within this exception. The Court notes that there is a longstanding rule of judicial deference to an agency's "reasonable interpretation" of its own regulations. *Udall v. Tallman*, 380 U.S. 1, 4, 85 S.Ct. 792, 795, 13 L.Ed.2d 616, 618 (1965). This rule is particularly relevant in the procurement area. *Kinnet Dairies, Inc. v. Farrow*, 580 F.2d 1260, 1270 (5th Cir. 1978).

The Court is not persuaded at this time that (1) there was a lack of "adequate competition" for the T–ARC 7 contract, (2) the Navy did not, in fact, accept the most favorable initial proposal, or (3) written or oral discussions, as that term is used,[8] occurred with any offeror. The Navy has made a strong showing that any "discussions" that took place were for clarification purposes only and that at no time was any offeror allowed to modify its proposal. Under the circumstances, the Court finds that plaintiff's and intervenor-plaintiff's probability of success is indeed in doubt.

## IV. CONCLUSION

In accordance with the foregoing, the motion for a preliminary injunction is denied. Sun Ship has asked this Court to obtain the expert advice of the General Accounting Office after ruling on its motion for a preliminary injunction. The Court is of the view that such an action will further delay the prompt resolution of this action. Therefore, the Court declines to grant Sun Ship's request. An order in accordance with the foregoing will be issued of even date herewith.

---

8. Within the meaning of 10 U.S.C. § 2304(g) and 32 C.F.R. § 3–805.1.