**SUN SHIP, INC., Plaintiff,**

**and**

**General Dynamics Corporation, Quincy Shipbuilding Division, Intervenor-Plaintiff,**

**v.**

**Edward HIDALGO et al., Defendants,**

**and**

**National Steel and Shipbuilding Co., Intervenor-Defendant.**

**Civ. A. No. 79–2734.**

United States District Court, District of Columbia.

Feb. 13, 1980.

---

**8.** Within the meaning of 10 U.S.C. § 2304(g) and 32 C.F.R. § 3–805.1.

Gerald P. Norton, Gilbert E. Geldon, Murray J. Belman, Pepper, Hamilton & Scheetz, Inc., Washington, D. C., for plaintiff, Sun Ship, Inc.

Herbert L. Fenster, E. Sanderson Hoe, Harvey G. Sherzer, Sellers, Conner & Cuneo, Washington, D. C., for intervenor-plaintiff, General Dynamics Corp., Quincy Shipbuilding Div.

Carl S. Rauh, U. S. Atty., Royce C. Lamberth, Asst. U. S. Atty., Mark N. Mutterperl, Dept. of Justice, Civ. Div., Kenneth Raisler, Asst. U. S. Atty., Washington, D. C., for government defendants; Allan Freidson, Edward Houry, Naval Sea Systems Command, Washington, D. C., of counsel.

Michael L. Burack, John H. Pickering, David M. Becker, Seth A. Davidson, Marie N. Doland, Wilmer & Pickering, Washington, D. C., for intervenor-defendant, National Steel and Shipbuilding Co.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

This case is before the Court on defendants' and intervenor-defendant's joint motion for summary judgment and plaintiff's

and intervenor-plaintiff's oppositions thereto. Since there is no genuine dispute as to facts material to the resolution of the claims raised by the plaintiffs,[1] summary judgment is appropriate. For the reasons more fully set forth below, the Court grants summary judgment to defendants [2] and dismisses this action.

This action was commenced by Sun Ship,[3] and later joined in by QSD,[4] to enjoin performance of a Navy contract to design and construct an ocean-going vessel which has a target cost in excess of $100 million. This ship, designated the "T–ARC 7", is to be used for retrieving, repairing and deploying cable along the ocean floor.

On October 17, 1979, after hearing argument of the parties,[5] the Court denied plaintiff Sun Ship's motion for a temporary restraining order. A hearing on plaintiffs' motion for a preliminary injunction was held on November 9, 1979, at which time the Court heard from all parties. In a memorandum opinion issued November 20, 1979, the Court denied plaintiffs' motion.

Plaintiffs have presented various challenges to the Navy's conduct throughout the several stages of the evaluation process involved in the T–ARC 7 procurement. Specifically, plaintiffs claim that the Navy unlawfully and irrationally awarded the contract for the detailed design and construction of the T–ARC 7 to NASSCO in violation of the Armed Services Procurement Act of 1947, as amended, 10 U.S.C. § 2301 et seq., and Defense Acquisition Regulations ("DAR") promulgated thereunder, 32 C.F.R. § 1 et seq.

The Court will first set forth the appropriate standard of review of a procurement decision by a Government agency and then proceed to consider plaintiffs' challenges in the approximate order in which they are alleged to have occurred.

## I. THE APPROPRIATE STANDARD OF REVIEW.

■ A reviewing court may not overturn a procurement decision by a Government agency unless the party challenging the decision overcomes the "heavy burden of showing either (1) the procurement official's decision on matters committed primarily to his own discretion had no rational basis, or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations." *Kentron Hawaii, Ltd. v. Warner,* 156 U.S.App. D.C. 274, 277, 480 F.2d 1166, 1169 (D.C. Cir. 1973) (footnote omitted); *See also, M. Steinthal & Co. v. Seamans,* 147 U.S.App. D.C. 221, 455 F.2d 1289 (D.C. Cir. 1971). In conducting its review, the Court's inquiry:

. . . must fully take into account the discretion that is typically accorded officials in the procurement agencies by statutes and regulations. Such discretion extends not only to the evaluation of bids submitted in response to a solicitation but also to determination by the agency with respect to the application of technical, and often esoteric, regulations to the complicated circumstances of individual procurements.

*M. Steinthal & Co., supra* 147 U.S.App.D.C. at 233, 455 F.2d at 1301. Furthermore, in

1. Plaintiff Sun Ship, Inc. ("Sun Ship") and intervenor-plaintiff General Dynamics Corporation, Quincy Shipbuilding Division ("QSD") are referred to collectively as "plaintiffs" except where it is relevant to differentiate between them.

2. Defendants Secretary of the Navy Edward Hidalgo, several subordinate Navy officials and the United States ("the Navy") and intervenor-defendant National Steel and Shipbuilding Company ("NASSCO") are referred to collectively as "defendants" except where it is relevant to differentiate between them.

3. Sun Ship's complaint was filed on October 15, 1979.

4. The Court granted leave to QSD to intervene as a plaintiff on November 8, 1979.

5. QSD was not present at the October 17, 1979, hearing. *See* n.4 *supra.* The Court granted leave to NASSCO to intervene as a defendant on October 17, 1979.

the field of government procurement "the courts must be sedulous to heed the admonition that their authority to vacate and enjoin action that is illegal must be exercised with restraint less the courts fall into the error of supposing that they may revise 'action simply because [they] happen to think it ill-considered, or to represent the less appealing alternative solution available.'" *Id.* 147 U.S.App.D.C. at 230–31, 455 F.2d at 1298–99 (citation omitted).

■ Finally, even in instances where the aggrieved bidder demonstrates that there was no rational basis for the agency's decision, a reviewing court, in the exercise of sound judicial discretion and in light of overriding public interest considerations, may properly refuse to grant declaratory or injunctive relief. *Id.* 147 U.S.App.D.C. at 233, 455 F.2d at 1301.

## II. *CONSIDERATIONS OF NATIONAL DEFENSE.*

Defendants contend that considerations of national defense preclude the relief sought by plaintiffs in this action. The Navy has consistently argued that timely completion of the T–ARC 7 is vital to the defense interests of the United States. This "overriding public interest consideration," the defendants contend, by itself compels 1) upholding the award of the T–ARC 7 contract, and 2) granting summary judgment in defendants' favor. The Court agrees with defendants' first contention but disagrees with their second.

■ The T–ARC 7, when completed, is to be used for retrieving, repairing and deploying cable along the ocean floor. This cable is part of a major Naval intelligence-gathering network which is clearly essential to the national defense.

The Navy's existing cable ships are more than thirty years old and do not have the capability to perform the functions envisioned for the T–ARC 7. Due to the inadequacy of the Navy's present cable ships and the T–ARC 7's projected role in aid of monitoring continued improvement in the operational capabilities of potential opposing naval forces, the Navy has concluded that it is essential to the national defense that the T–ARC 7 be placed in service when projected.

The hearings on appropriations for the T–ARC 7 highlight the importance of the vessel to the national defense. Vice Admiral James H. Doyle, Jr., Deputy Chief of Naval Operations for Surface Warfare, told the House Committee on Armed Services: "The systems of underwater surveillance and communications which the Navy maintains for both the Navy and Air Force require four cable repair ships to insure system operability in the face of cable breaks imposed by fishing trawler equipment or natural causes in far-flung areas of the world." *Hearings on Military Posture and H.R. 10929 Department of Defense Authorization for Appropriations for Fiscal Year 1979 before the House Committee on Armed Services*, 95th Cong., 2d Sess., Part 4, at 202 (1978) ("Hearings"). In addition, Admiral Doyle stated that "the new cable repair ship is vital to maintaining and improving the undersea surveillance capability which is a prerequisite to effective anti-submarine warfare." *Hearings* at 369. Rear Admiral Bruce Kenner, III, Director of Ship Acquisitions Division, Office of the Chief of Naval Operations, testified that the T–ARC 7 is "extremely important to our continued ability to control the seas to the extent necessary to support our forces overseas." *Hearings* at 1039. Finally, Congressman Bennett, Chairman of the Seapower and Strategic and Critical Materials Subcommittee of the House Armed Services Committee, noted that "in a year of austere funding for naval shipbuilding by the administration, the Secretary of the Navy has among his highest priorities the procurement of the T–ARC and T–AGOS ships." *Hearings* at 1008.

In support of its contention, defendants rely on the affidavit, filed January 14, 1980, of Edward Hidalgo, Secretary of the Navy.

Secretary of the Navy Hidalgo has occupied that office since October 24, 1979. Prior to that date, Secretary Hidalgo held the office of Assistant Secretary of the Navy (Manpower, Reserve Affairs and Logistics) from April 25, 1977, to October 24, 1979.

In his affidavit, Secretary Hidalgo has certified to the Court that the delay caused by overturning the award of the T–ARC 7 contract to NASSCO would "have a significant adverse impact on the national security of the United States." Moreover, the Secretary states that "[t]he importance of the T–ARC 7's mission—and thus the need for prompt acquisition—has been dramatically heightened by recent international developments."

■ The Court concludes that timely completion of the T–ARC 7 is an "overriding public interest consideration" which compels upholding the award of the contract to NASSCO. *M. Steinthal & Co. v. Seamans, supra* 147 U.S.App.D.C. at 233, 455 F.2d at 1301; *Pace Co. v. Resor*, 453 F.2d 890, 891 (6th Cir. 1971) (per curiam), *cert. denied*, 405 U.S. 974, 92 S.Ct. 1192, 31 L.Ed.2d 248 (1972). *See also, Curran v. Laird*, 136 U.S.App.D.C. 280, 287, 420 F.2d 122, 129 (D.C.Cir.1969). It is not within the province of the Court to determine exactly where the interests of the national defense lie. Such a determination, by its very nature, is not judicial, but within the executive and legislative spheres. Rather, the Court accepts the determination of the highest official of the Navy, Secretary Hidalgo. The Secretary has certified to the Court, based in part on classified information, that it is "vital to the national defense that the Navy not be required to terminate its present contract with National Steel . . . ." The Court has no reason to question the veracity, good faith or expertise of Secretary Hidalgo in this sensitive area. Accordingly, the Court finds that considerations of national defense preclude the injunctive relief which plaintiffs seek.

Plaintiffs strenuously challenge Secretary Hidalgo's determination on several grounds. Plaintiffs characterize the Navy's determination that the T–ARC 7 is vital to the national defense as a "last-minute" effort

to uphold the NASSCO contract and as totally inconsistent with the history of the T–ARC 7 procurement and the history of this case. Such a characterization is simply unfounded as statements of the witnesses before the House Committee on Armed Services indicate. It cannot be disputed that since at least 1975 the Navy has consistently claimed that the T–ARC 7 is a "critical" item. Furthermore, a review of the record of this case clearly illustrates that the Navy's claim that national defense interests are involved is not a "last-minute" effort to uphold the contract awarded to NASSCO. *See, e. g.*, the Court's memorandum opinion denying plaintiffs' motions for a preliminary injunction, filed November 20, 1979, at 2–3, 11.

In sum, plaintiffs' disagreement with the Secretary's judgment does not, and cannot, create a triable issue of fact. Decisions as to what is or is not in the interest of national defense lie outside the judicial domain. Such decisions are properly within the domain of the legislative and executive branches of the Government.

■ While national defense considerations preclude the injunctive relief which plaintiffs seek, such consideration cannot preclude the declaratory relief also sought. As the Supreme Court made clear in *Powell v. McCormack*, 395 U.S. 486, 517–18, 89 S.Ct. 1944, 1962, 23 L.Ed.2d 491 (1969): "The Declaratory Judgment Act, 28 U.S.C. § 2201, provides that a district court may 'declare the rights * * * of any interested party * * * whether or not further relief is or could be sought.' . . . [A] request for declaratory relief may be considered independently of whether other forms of relief are appropriate." *See also Atchison, Topeka and Santa Fe Railway Company v. Alexander*, 480 F.Supp. 980 at 1002 (D.D.C.1979).

### III. PLAINTIFFS' CHALLENGES TO THE T–ARC 7 PROCUREMENT.

#### A. The Technical Evaluation by the Source Selection Evaluation Board (SSEB).

The function of the SSEB was described by the Court in its memorandum opinion

denying plaintiffs' motion for a preliminary injunction. *See,* Memorandum Opinion, filed November 20, 1979, 484 F.Supp. 1348, pp. 1350–1352 ("opinion"). A coherent discussion of plaintiffs' challenges to the SSEB's technical evaluation warrants a brief summary of that function here.

The SSEB consisted of six members who were supported by a team of twenty-two evaluators including engineering, contracting, technical and management personnel. The SSEB was to analyze and evaluate the T–ARC 7 proposals in all categories,[6] except "Cost Realism," to determine the need for clarification of, or the existence of deficiencies, in, the proposals. The SSEB also was to prepare evaluation narratives, perform criteria scoring, and submit the result of its analysis to the Source Selection Advisory Council (SSAC).

When the technical/management proposals were submitted, the SSEB assigned two evaluators to each of the sixty-nine elements into which the proposals were divided. Each evaluator, working separately, reviewed the proposals and evaluated them with respect to those elements assigned to him for review. The evaluator determined scores for each element on a scale ranging, in increments of 20, from 0 to 100. *See* Jt.Ex. D, pp. 7–8.[7] Each evaluator also prepared a narrative explaining each score. *See* Jt.Ex. Q. The evaluator's narratives were submitted to the SSEB via category leaders (who were members of the SSEB).

The SSEB reviewed the scores given by the evaluators for the various elements, reconciled differences between the evaluators' scores, and adjusted scores it deemed incorrect. The SSEB also prepared a narrative describing the composite scores, and explaining, as to each element reviewed, the adjustments and reconciliations. *See* Jt.Ex. Q. Finally, the SSEB prepared an Evalua-

tion Report on the technical/management proposals for the SSAC. *See* Jt.Ex. R. This report was issued on April 25, 1979, and the results of the SSEB's evaluations were presented to the SSAC on May 2–4, 1979. *See* Jt.Ex. V, p. 4.

Plaintiffs challenge the power and authority of the SSEB to adjust the scores of the evaluators. In support of the challenge, plaintiffs rely on § 7.5 of the Source Selection Plan for the T–ARC 7 (SSP):

The category leaders and the SSEB shall screen the subcategory evaluation narratives for conformance to the Source Selection Plan and this Supplement and for conflicts in the evaluation. The SSEB shall attempt to resolve differences in the evaluations by discussion with the evaluators, but shall have no authority to change or direct a change in the evaluation narratives without voluntary concurrence by the evaluator.

Jt.Ex. D, § 7.5. Plaintiffs' reliance on this section of the SSP is misplaced. This section does not limit the SSEB's authority to review and adjust evaluators' scores where it finds such adjustments appropriate. It merely limits the SSEB's authority unilaterally to rewrite the evaluator's narratives. This, the SSEB did not do. The evident purpose of this requirement is not to prevent the SSEB from applying its own judgment, but rather merely to document disagreements between the SSEB and the evaluators, such as those of which plaintiffs now complain. As indicated above, the SSEB prepared a narrative describing the composite scores, and explaining, as to each element reviewed, the adjustments and reconciliations. *See* Jt.Ex. Q. The Court finds such a procedure rational and consistent with the SSP.

B. *The Navy's Cost Evaluation*

Plaintiffs challenge the Navy's cost evaluation of the T–ARC 7 proposals on several

---

6. Each proposal was divided into nineteen subcategories. These subcategories, in turn, were divided into specific elements. Thus, each proposal consisted of sixty-nine elements which comprised nineteen subcategories.

7. "Jt.Ex." indicates references to the *Joint Exhibits of Defendants and Intervenor-Defendants,* filed November 2, 1979.

grounds. Specifically, plaintiffs claim 1) the Navy failed to conduct a required "cost analysis" on the respective proposals; 2) the Cost Realism Team's methodology was irrational in that the use of an "averaging" technique by the Navy to establish benchmarks by which the proposals were evaluated was irrational; 3) the Navy's use, or non-use, of the pre-award surveys was inconsistent with the SSP and irrational; 4) the CRT's overhead adjustments were irrational; and 5) the Navy's conclusion that the difference in the estimated cost between the NASSCO and Sun Ship proposals was immaterial, was irrational.

Defendants contend that the cost evaluation of the T–ARC 7 proposals was proper in all respects and seek summary judgment on all five issues. There is no genuine dispute as to any fact material to the questions of law regarding plaintiffs' challenges to the Navy's cost evaluation. The Court concludes defendants are entitled to summary judgment on these issues as a matter of law. The Court will consider plaintiffs' challenges *seriatim* below.

· ■ In reviewing the Navy's cost realism determination the Court is keenly aware of the deference owed to agency determinations on cost realism. In *Kentron Hawaii, Ltd. v. Warner, supra,* 156 U.S.App.D.C. at 280, 480 F.2d at 1172, the Court of Appeals for this Circuit noted that "decisions on cost realism and feasibility are squarely within the area of the contracting officer's expertise." Furthermore, the Court of Appeals stated that it wholeheartedly agreed with the following statement of the Comptroller General as to the degree of deference owed an agency's determination of cost realism in cases such as the one at bar, *Id.* at n.16:

> [T]he award of cost reimbursement contracts requires exercise by procurement personnel of informed judgments whether submitted proposals are realistic as to proposed costs as well as to technical approach . . .. Further, we believe that such judgments properly should be left to the discretion of the contracting

agencies concerned since they are in the best position to assess 'realism' of costs . . . and must bear the major criticism for any difficulties or expense experienced by reason of a defective cost analysis.

*Trans World Airline,* B–171291, 50 Comp. Gen. 592, 600 (1971).

Moreover, the Defense Acquisition Regulations ("DAR") indicate the procuring agency has substantial discretion in determining the method and scope of cost analysis to be used in any given procurement. *See* DAR 3–807.1(d); 3–801.5(b)(1).

The Court has conducted a careful review of the procurement record with regard to the Navy's cost evaluation of the T–ARC 7 proposals. The Court can neither conclude that the Navy's evaluation had no rational basis, nor perceive any clear and prejudicial violation of statute or regulations.

1. *The Navy's "Cost Analysis".*

Plaintiffs contend that the Navy failed to conduct a "cost analysis" on the respective proposals which, it is alleged, is required by the Source Selection Plan ("SSP") for the T–ARC 7, and Defense Acquisition Regulations applicable thereto. The Navy claims that it was not required to conduct the cost analysis because its actions fall within an exception to the requirement. The material facts on this issue are not genuinely in dispute. For the reasons set forth below, the Court grants summary judgment to the defendants on this issue.

Section 7.8 of the SSP provides: "Cost analyses and audits will be conducted only on those proposals determined to be within the competitive range. . . . Cost analyses and audits will be in accordance with DAR 3–807.2 and 3–809." Jt.Ex. D, ¶ 7.8. The Navy concedes that all six proposals were initially determined to be in the competitive range.

DAR 3–807.1(d) provides that "[s]ome form of price or cost analysis is required in connection with every negotiated procurement action. The method and degree of

analysis, however, is dependent on the facts surrounding the particular procurement and pricing situations."

DAR 3–801.5(b)(1) provides for field pricing support for the contracting officer in the form of a field pricing support report ("FPR"). Such a report generally has two parts: a Technical Analysis Report ("TAR"), and an Advisory Audit Report ("AAR"). TARs and AARs are intended to provide support for the contracting officer's request for authority to negotiate or contract (such authority is denoted "Business Clearance"). *See*, Ex. K–27, p. 2.[8] The purpose of the TAR is to comment on the technical aspects of an offeror's proposal, including the offeror's estimates for material and labor. *Id.* at 2, 4 and 12. Personnel from the cognizant SUPSHIP office are responsible for developing historical data and other information to substantiate those estimates. *Id.* p. 12, ¶ 6. The purpose of an AAR is to evaluate the labor and overhead rates, material cost and other data associated with the pricing of the offeror's proposal. *Id.* at p. 8. AARs involve "examinations by contract auditors of contractors' statements of actual or estimated costs to the extent deemed appropriate by the auditors," DAR 3–809(a), and are conducted by personnel of the Defense Contract Audit Agency ("DCAA"), who have broad discretion to determine the scope and degree of detail in an audit.[9]

DAR 3–801.5(b)(1) specifically provides that FPRs, including TARs and AARs, shall be requested by the contracting officer unless information already available is adequate to determine the reasonableness of the proposed cost or price. If the contracting officer determines that current data is adequate to support a waiver of a FPR, he is to document the contract file to reflect the reason for such waiver.

DAR 3–807.3 also requires cost or pricing data to be submitted by the offerors "unless the price negotiated is based on adequate price competition . . ." DAR 3–807.-3(b). DAR 3–807.7(a)(1) defines price competition as existing ". . . if offers are solicited and (i) at least two responsible offerors, (ii) who can satisfy the requirements, (iii) independently contend for a contract to be awarded to the responsive and responsible offeror submitting the lowest evaluated price, (iv) by submitting priced offers responsive to the expressed requirements of the solicitations." In addition, DAR 3–807.7(a)(1) also provides that "[w]hether there is price competition for a given procurement is a matter of judgment to be based on evaluation of whether each of the foregoing conditions is satisfied. Generally, in making this judgment, the smaller the number of offerors, the greater the need for close evaluation."

While DAR 3–807.7(a)(1) defines "price" competition rather than "cost" competition, the Comptroller General has held that the regulation is applicable to cost-type contracts. *Dynalectron Corp.*, B–176217, 52 Comp.Gen. 346, 350 (1972).

Plaintiffs' principal contention is that full FPRs, including detailed TARs and AARs, should have been prepared and used in the cost analysis of the offerors' proposals. Defendants claim that adequate price competition existed and therefore, the various reports were not required.

It is clear that the Navy initially contemplated full field pricing reviews of the proposals. However, a decision was reached in early April, 1979, to limit the scope and detail of the reviews and to conduct reviews only at a general overview level instead of undertaking a detailed examination. *See* Ex. K–44. The general overview did not include detailed TARs and AARs on all

---

**8.** "Ex.–" indicates references to the procurement documents used as deposition exhibits, filed with the Court on January 18, 1980.

**9.** See DAR 3–809(a) ("Such audit reviews or audits may consist of desk reviews, test checks of a limited number of transactions, or examinations in depth, at the discretion of the auditor."). The auditor's role in performing "field pricing support reports" is set out in detail in DAR 3–801.5(b)(5), (7), (9).

offerors. Such a limitation of the reviews could be justified only by a determination that "adequate price competition" existed for the T–ARC 7, DAR 3–807.3(b), or that information already available to the contracting officer was adequate to determine the reasonableness of the proposed cost or price. DAR 3–801.5(b)(1). In justifying the limitations of the review, the Navy advanced the following reasons: (1) the high level of competition received for the T–ARC contract,[10] (2) the availability of concurrent evaluations of the offerors' proposals, and (3) the existence of severe manpower and budgetary constraints at some of the cognizant SUPSHIP offices.[11]

The first reason above encompasses the Navy's claim that adequate price competition existed for the T–ARC 7. It is clear that such a determination is a matter left to the sound discretion of the agency. DAR 3–807.7(a)(1). The Court has reviewed the factors to be considered by the agency in making the determination and cannot conclude that the Navy had no rational basis in making the determination. Given the high level of competition for the T–ARC 7 contract, it was reasonable for the Navy to conclude that competition adequate to limit the field pricing reviews existed. In addition, DAR 3–807.1(d) and 3–809(a) give an agency discretion in determining the method and degree of cost analyses and audits. The Court has fully considered the discretion that is accorded to Navy officials by the applicable regulations and concludes that the Navy had a rational basis for its determination to limit the cost analyses conducted on the T–ARC 7 proposals. *M. Steinthal & Co., supra* 147 U.S.App.D.C. at 233, 455 F.2d at 1301. Furthermore, the Court concludes that the discretion accorded the Navy by the applicable regulations, to limit the cost analyses to be performed on the T–ARC 7 proposals, allows the Navy to deviate from the procedure prescribed in the SSP. The cost analysis required by the SSP was not required because the Navy rationally determined that adequate price competition existed.

Plaintiffs correctly point out that DAR 3–801.5(b)(1) dictates that when the contracting officer determines that current data is adequate to support a waiver of a FPR, he shall document the contract file to reflect the reason for such waiver. While intervenor-plaintiff claims that no such documentation occurred, it advances no reason why such an omission could be considered prejudicial to it. Indeed, the Court cannot conclude that such an administrative failure, while constituting a technical violation of DAR 3–801.5(b)(1), is prejudicial to any offeror. Moreover, in the letters dated April 10, 1979, which directed the six cognizant SUPSHIP offices to perform only an overview on the respective proposals rather than a full FPR, the contracting officer indicated his reasons for waiving the full FPR. *See* Ex. K–29. Since these letters are clearly part of the procurement record of the T–ARC 7, the Court concludes that the documentation requirement of DAR 3–801.5(b)(1) was satisfied.

Finally, plaintiff Sun Ship advances the disingenuous argument that since the Request For Proposals ("RFP") required the offeror awarded the contract to submit a "Certification of current cost or pricing data," Jt.Ex. B, p. 45, the Navy was precluded from later determining that there was "adequate price competition", which determination, in turn, allows waiver of full and detailed FPRs. In support of this argument, Sun Ship relies on DAR 3–807.-7(a)(4), which provides that prices based on adequate price competition exempt offerors from the requirements for submission and certification of cost or pricing data. The Court will not accept Sun Ship's contention

---

**10.** Six responsible and qualified offerors were in the competition for the T–ARC 7 contract. As already indicated, the Navy found all six proposals to be in the competitive range.

**11.** *See* Ex. K–29. The SUPSHIP offices indicated on several occasions that they needed additional resources in order to perform detailed TARs. Exs. K–28, K–30 and R–2.

that DAR 3–807.7(a)(4), together with the RFP requirement of a certificate of cost and pricing data, precludes the Navy from later making a determination of adequate price competition. At the time the RFP was drafted, the Navy could not anticipate that there would be adequate price competition. The Court finds it reasonable, therefore, that provision was made for the certificate procedure. DAR 3–807.3(e) clearly indicates the possibility that the determination of adequate price competition may occur after cost or pricing data are initially requested. The requirement of certification in the RFP, therefore, is not binding upon the Navy if it later determines that adequate price competition exists. Thus, the Navy is not precluded from determining adequate price competition simply because the RFP initially requested certification of cost and price data. *See Dynalectron Corp., supra* at 351.

Sun Ship also relies on DAR 3–807.3(e) in support of its preclusion theory. Again, the Court finds the argument unpersuasive. The regulation provides that if, after cost or pricing data were initially requested and received, it is determined that adequate price competition does exist, the data need not be certified. Sun Ship argues that since the Navy required NASSCO to submit a certification of cost and pricing data, *See* S/S Exs. 5, 6 p. 3,[12] it is demonstrable that the Navy did not determine that there was adequate price competition at any time. The Court will not grant its imprimatur to such an interpretation of DAR 3–807.3(e). This regulation provides that cost and pricing data *need not* be certified once adequate price competition has been determined. This provision of the regulation does not provide, as Sun Ship argues, that certification *shall not* be requested. Signif-

icantly, the "shall not" language is used when the regulation speaks to anticipation from the outset that there will be adequate price competition, but "need not" language is employed when the regulation speaks to the determination of adequate price competition after cost or pricing data were initially requested.[13] The Court will not read "need not" to preclude a request for certification unless adequate competition is deemed not to exist. The regulation does not prohibit the Navy from requesting a certificate in cases where there is adequate competition; it merely states that no certificate is needed. Thus, the Navy's request of NASSCO to certify its cost and pricing data does not establish that the Navy did not determine that there was adequate price competition at any time.

In sum, the Court cannot conclude that the Navy's discretionary actions in limiting its cost analysis had no rational basis. Furthermore, plaintiffs have not established any clear and prejudicial violations of applicable statutes or regulations with respect to the limitation of costs analyses on the T–ARC 7 proposals.

2. *The Navy's Averaging Technique.*

Plaintiffs challenge as irrational the Navy's use of averaging techniques to establish "benchmarks" for cost-evaluation purposes. However, plaintiffs' challenge ignores the equal and unbiased application of this technique to all offerors. *Dynalectron Corp., supra* at 351. Further, the Court can perceive no material distinction between the technique employed here and that utilized by the Army and upheld by the Comptroller General in *Dynalectron.* The Court is compelled to conclude that the Navy's use of this averaging technique indeed had a rational basis and did not consti-

---

**12.** "S/S Exs." indicate reference to *Exhibits to Affidavit of Gilbert E. Geldon,* filed on January 22, 1980.

**13.** The pertinent provisions of DAR 3–807.3(e) provide:

When it is anticipated from the outset that there will be adequate price competition, cost

or pricing data *shall not* be requested. If, after cost or pricing data were initially requested and reviewed, it is determined that adequate price competition does exist, the data *need not* be certified. (emphasis added).

tute a violation of any applicable statute or regulation.

3. *The Navy's Overhead Adjustments.*

Plaintiffs challenge as irrational the Navy's adjustments to the figures in the T–ARC 7 proposals representing the cost of overhead. In addition, intervenor-plaintiff QSD contends the Navy's rejection of its proposal to limit the Navy's liability for overhead costs was contrary to statute and irrational.

In essence, plaintiffs' challenges regarding overhead seek a determination by the Court of a realistic estimate for the cost of overhead in their respective proposals for the design and manufacture of the T–ARC 7. The Court lacks the expertise to make such a determination. Further, it would be impermissible for the Court to make such an intrusion into this complex area and "second-guess" the Navy's experts. *M. Steinthal, supra* 147 U.S.App.D.C. at 230–31, 455 F.2d at 1298–99.

The Court has carefully examined the Cost Realism Report and its Addendum with particular emphasis to the discussion therein concerning overhead rates and cannot conclude that the Navy's handling of this complex matter had no rational basis or was in violation of statute or regulation. *See* Jt.Exs. S and U.

Intervenor-plaintiff QSD's challenge to the Navy's rejection of its proposed "overhead ceiling" as violative of 10 U.S.C. § 2306(a) (1976) is clearly without merit. That section confers discretion upon the head of an agency to make any kind of contract that he considers will promote the best interests of the United States. It does not, as QSD argues, require the agency head to accept a proposed contract provision because the proposer claims it will be advantageous to the government. Moreover, it is beyond dispute that the Navy *considered* QSD's proposed "overhead ceiling," but rejected it. The Court cannot conclude that the Navy had no rational basis in rejecting QSD's proposed "overhead ceiling"

or that such rejection constitutes a violation of any statute or regulation.

4. *The Pre-award Surveys.*

Plaintiffs challenge as irrational and inconsistent with § 7.7 of the SSP the Navy's use, or more accurately, its non-use, of the pre-award surveys which were conducted in connection with the evaluation of the T–ARC 7 proposals. The Court finds no merit in the challenge.

In essence, plaintiffs argue that 1) the results of the pre-award surveys should have been furnished to the SSEB as an aid in its evaluation of the proposals, and 2) the results of the pre-award surveys should have been accorded more weight in the overall evaluation process.

It is clear that the contracting officer received the pre-award survey reports and that the SSAC received information as to the findings and recommendations of the surveys. *See* Ex. K–8, P–2 and K–9. Thus, information from the surveys was available to integral components in the decision-making scheme for the T–ARC 7 procurement. The Court cannot conclude that it was prejudicial to plaintiffs that the survey reports were not made available to the SSEB. While the Court may not agree with the procedure utilized, it cannot conclude it irrational since the findings and recommendations of the survey were available to the ultimate decision-makers for the T–ARC 7 procurement.

Plaintiffs' challenge regarding the weight accorded the pre-award surveys is not persuasive. The purpose of pre-award surveys is to aid "the contracting officer in determining the prospective contractor's responsibility," *i. e.* "capability to perform" if the contract is awarded to it. DAR 1–905.4(a). Plaintiffs advance no regulation or persuasive argument which would require the decision-maker to accord more weight to the pre-award surveys than to the other evaluation factors in a procurement.

In sum, the Court cannot conclude that the Navy had no rational basis in its use of

the results of the pre-award surveys. Nor can the Court perceive any clear and prejudicial violation of statute or regulation with respect to the pre-award surveys generally.

### 5. The Navy's Determination of Equivalence of the NASSCO and Sun Ship Cost Proposals.

Plaintiff Sun Ship challenges the Navy's determination of essential equivalence between NASSCO's and Sun Ship's cost proposals. Sun Ship argues that it should have been awarded the contract because it was the low cost bidder.

As originally submitted, NASSCO's cost proposal was $107,153,000 and Sun Ship's was $103,851,000. Jt.Exh. V, p. 41. The Cost Realism Team adjusted these proposed costs in light of its review and evaluation of the proposals. In its May 7, 1979, Report, the Cost Realism Team adjusted NASSCO's estimated cost to $125,605,000 and Sun Ship's estimated cost to $119,736,000. Jt.Ex. S pp. 34, 41. As directed by the SSAC, Jt.Ex. V, p. 41, the Cost Realism Team subsequently refined these estimates as reflected in its June 6, 1979, Addendum to the Cost Realism Report. The refined estimated costs were $121,434,000 for NASSCO and $116,323,000 for Sun Ship. Jt.Ex. U, p. 2. Thus, the estimated cost for Sun Ship, set forth in the June 6, 1979, Addendum, was $5.1 million lower than the estimated cost for NASSCO.

In support of its argument that as low bidder it should have been awarded the T–ARC 7 contract, Sun Ship relies on the provision in the RFP which states: "The degree of importance of cost will increase with the degree of equality of the proposals in the technical/management criteria and factors listed above." Jt.Ex. C, p. 3. Since the Navy had already determined NASSCO and Sun Ship essentially equal in technical/management evaluation, Jt.Ex. V, p. 40, Sun Ship argues it should have been awarded the contract as low-cost bidder. Further, Sun Ship characterizes the Navy's determination of essential equivalence between the cost proposals of NASSCO and Sun Ship as irrational. The Court disagrees.

The Court does not accept the contention that, once the Navy found essential technical/management equivalence between NASSCO and Sun Ship, it was irrational not to accept the technically low-cost bidder. In several different sections, the RFP admonished offerors to "be aware that the government will not necessarily award a contract to the firm who proposes the lowest Target Cost." Jt.Ex. B, pp. 15, 46.

Moreover, the Defense Acquisition Regulations also indicate that cost should not be considered controlling in cost-reimbursement-type contracts. See DAR 3–803(c). The SSAC's reasoning, supporting its evaluation of the cost proposals of NASSCO and Sun Ship, is set forth in the following excerpt from its Report:

Using the resources of the NAVSEA Ship Cost Estimating Group, the Defense Contract Audit Agency, and the Field Pricing Reports submitted by the cognizant Supervisors of Shipbuilding in the field, the Cost Realism Team developed individual estimates for each shipbuilder. Because the Request for Proposals had stated that the element of cost would become increasingly important if the technical proposals became very close, the SSAC had a number of briefings by the Cost Realism Team. Because of the close competitive scoring of NASSCO and SUN, the SSAC required the Cost Realism Team to perform more extensive analysis of the likely cost outcome of those offering the three top technical proposals. The final results are then as follows:

|  | Government Estimate | Contractor Proposals |
|---|---|---|
| SUN | $116.323M | $102.851M |
| NASSCO | $121.434M | $107.153M |

. . . The variance in the final estimate between SUN and NASSCO is about five million dollars or slightly over four percent. Recognizing that this small variance is based on estimates that carry

the weight of uncertainty in predicting the cost outcome over the design and building period of the T–ARC, and since the resultant contract is a cost type in recognition of this uncertainty, the four percent difference in estimates is not of a significant magnitude to ensure that an award to SUN would ultimately result in least cost to the Government. It is the judgment of the Source Selection Advisory Council, therefore, that these factors result in a conclusion that the estimated difference in cost between the two low offerors is not a significant enough basis upon which to determine a successful offeror. Therefore, on total estimated cost, as well as technical criteria, SUN and NASSCO are deemed to be essentially equal.

The Court does not find it irrational for the Navy to conclude that Sun Ship's and NASSCO's cost proposals were essentially equal, in light of the uncertainties inherent in predicting the costs of a unique and technological ship such as the T–ARC 7. The variance between the Sun Ship and NASSCO final estimates was approximately $5 million or four percent. The Court cannot conclude that the Navy had no rational basis in determining this variance small and not of a significant magnitude to ensure that an award to Sun Ship would ultimately result in the least cost to the Government. To the contrary, the Court finds that the SSAC had the expertise and discretion to make such a determination and it was not irrational for the SSAC to exercise its discretion in the manner it did.

### C. The Navy's Use of Tie-breaker Criteria

Plaintiffs contend that the Navy exceeded its legal authority and acted irrationally in its selection and application of additional criteria to break the tie between the Sun Ship and NASSCO proposals. Specifically, plaintiffs argue: 1) it was impermissible for

the Navy to use unannounced criteria to break the tie, and 2) the criteria used by the Navy favored shipyards which were already conducting Navy business. The facts material to these issues are not genuinely in dispute. For the reasons set forth below, the Court finds plaintiffs' contentions without merit and grants summary judgment to defendants on these issues.

Due to the finding by the SSAC that NASSCO's and Sun Ship's proposals were essentially equal in both technical/management and cost criteria, the SSAC evaluated several other factors that it determined "would bear on execution of this program, or that might otherwise have positive or negative effects upon other Navy programs." Jt.Ex. V, p. 42. These factors have been referred to as the "tie breakers." The tie breakers utilized by the Navy were as follows: [14]

1) "impact of the T–ARC 7 program on overhead rates of other Navy programs,"

2) "contract administration office,"

3) "contribution to other Navy programs,"

4) "workload fit," and

5) "industrial and competitive base."

See Jt.Ex. V, p. 2. These tie breakers admittedly were adopted by the SSAC without discussion of them with NASSCO or Sun Ship. On the basis of these factors, the SSAC concluded it was clear that: ". . . award to [NASSCO] carried the advantages of contract administration, workload fit, contribution to other Navy programs and impact on overhead rates; advantages that would not be found in an award to [Sun Ship]. Award to [Sun Ship] had the advantage of expanding the competitive base." Id. p. 45. Accordingly, "based on the foregoing," the SSAC recommended that the contract be awarded to NASSCO. Id.

Plaintiffs argue and cite authority to the effect that offerors should be advised of the

---

14. In addition to the tie breakers listed, the Navy also determined that both NASSCO and Sun Ship were located in labor surplus areas and that neither was a small business. Jt.Ex. V. p. 45.

evaluation factors to be used and the relative importance of those factors. *See, e. g., Kentron Hawaii, Ltd. v. Warner, supra* 156 U.S.App.D.C. at 289, 480 F.2d at 1171. However, the authority upon which plaintiffs rely does not address the situation which confronted the SSAC in the T–ARC 7 procurement; namely, a tie between two offerors in both technical/management and cost criteria. It cannot be contested that the RFP clearly advised the offerors of the evaluation factors to be used, notwithstanding the tie situation, and the relative importance of those factors. The RFP did not envision fully nor offer guidance respecting resolution of tie situations. The SSAC rationally reverted to the underlying principle which guides procurement decisions, i. e., select the proposal offering the greatest value to the Government. *General Electric Co. v. Kreps,* 456 F.Supp. 468, 473 (D.D.C. 1978). Moreover, in a recent decision directly addressing the issue of use of unannounced criteria to resolve a tie, the Comptroller General stated:

> When . . . competing proposals are measured against the evaluation factors established for the procurement and the selection official, in the good faith exercise of the discretion vested in him, is unable to discern an appropriate choice on the basis of that evaluation, we think that official properly may take into account other factors which are rationally related to a selection decision for the particular procurement involved.

*Group Hospital Service, Inc.,* 58 Comp.Gen. 263, 270 (1979). The Court concurs in the judgment of the Comptroller General on this issue.

Therefore, the Court must determine whether the award to NASSCO is rationally supportable on the basis of the additional criteria considered by the SSAC. Initially, the Court finds that the five additional "tie breakers" considered by the SSAC are rationally related to the specified goal of obtaining the contract that will be the most advantageous to the Government, price and other factors considered. Jt.Ex. B, pp. 15, 46; *Accord,* DAR 3–803(c), 3–801.1. Finally, the Court has carefully reviewed the SSAC's evaluations of Sun Ship's and NASSCO's proposals with regard to the five additional criteria and cannot conclude the SSAC had no rational basis for its determinations on these criteria. *See* Jt.Ex. V, pp. 42–45.

Plaintiffs' contention that the additional criteria favor shipyards with existing Navy work and therefore are impermissible is not persuasive. The benefits to the Government, derived from continued use of current contractors, cannot be denied. Indeed, the Court can perceive no material distinction between such benefits and the advantages of incumbency which the Comptroller General upheld as a "tie breaker" in *Group Hospital Service, Inc., supra* at 270–71. As the Comptroller General stated, the Government is not required to equalize the "natural" advantages arising out of incumbency. *Id.*

Plaintiffs, most notably QSD, contend that the Navy's use of the additional criteria without Secretarial authorization is a violation of 10 U.S.C. § 2304(a)(16) (1976) and regulations promulgated thereunder. The contention is patently without merit. 10 U.S.C. § 2304(a)(16) has no application to the issue of use of additional criteria to resolve a tie between two offerors; it simply provides authority to support a determination to procure by negotiation. The Navy properly invoked 10 U.S.C. § 2304(a)(10) (1976) to support its determination to procure by negotiation rather than formal advertising. Having done so, there was no need for the Navy to invoke another section of the statute which grants authority that the Navy, in fact, already had.

In sum, the Court finds that the Navy rationally selected and used additional criteria to resolve the tie between the T–ARC 7 proposals of Sun Ship and NASSCO. In addition, the Court cannot perceive any clear and prejudicial violation of statute or

regulation with respect to the Navy's selection and use of these additional criteria.

### D. Discussion and Best and Final Offers

Plaintiffs contend the Navy's use of a "Four-Step Procurement" mandated "discussions" with the offerors and an opportunity to submit best and final offers. In support of this contention, plaintiffs rely on DAR 4–107 and Department of Defense ("DOD") Directive 4105.62 (¶ III.D.). Defendants argue that although the T–ARC 7 procurement was originally planned as a four-step process, it was never intended to be a "Four-Step Procurement" pursuant to DAR 4–107 and DOD Directive 4105.62. Rather, the defendants contend, the T–ARC 7 procurement was a traditional negotiated procurement governed by the provisions of DAR 3–805.

DAR 4–107 provides that a procuring agency shall conduct discussions with offerors following the submission of cost proposals. Thereafter, the agency shall establish a competitive range and shall solicit best and final offers from all offerors within the competitive range. DAR 4–107.5(c)(3), (d). Finally, one offeror will generally be selected for final negotiations. DAR 4–107.5(f). DOD Directive 4105.62 essentially provides for the procedure established in DAR 4–107 outlined above.

For purposes of the case at bar, the chief distinction between the "Four-Step" procedure outlined above and the conventional negotiation procedure of DAR 3–805 is that the latter provides for an exception to the requirement of discussions while the former does not. See DAR 3–805.1. Thus, the Navy claims that meaningful discussions were not required because the T–ARC 7 procurement was within the exception provision of DAR 3–805.1(v). The threshold determination therefore, is whether the T–ARC 7 procurement is subject to the "Four-Step" procedure of DAR 4–107 and DOD Directive 4105.62 or the traditional negotiation procedure of DAR 3–805. For the reasons set forth below, the Court finds that the T–ARC 7 procurement is governed by the traditional negotiation procedure established in DAR 3–805.

DAR 4–107.1(c) and 4–107.2 state that the "Four-Step" procurement procedure is applicable to "all competitively negotiated research and development acquisitions." DOD Directive 4105.62 (III.D.5.) establishes that the "Four-Step" procedure "will cover advanced, engineering, or operational system development effort." It seems clear that the T–ARC 7 procurement is not a "research and development acquisition" or an "operational system development effort." The SSP states that the T–ARC 7 procurement does not involve "development" and that "[a]ll systems are state of the art and exist in similar applications." Jt.Ex. D, p. 1–1, ¶ 1.2. Furthermore, Section C.10(g) of the RFP for the T–ARC 7 procurement, Jt.Ex. B, p. 15, is clearly inconsistent with the "Four-Step" procurement procedures of DAR 4–107 and DOD Directive 4105.62 which require discussions and best and final offers. This section of the RFP provides: "The Government may award a contract, *based on initial offers received, without discussion of such offers.* Accordingly, each initial offer should be submitted on the most favorable terms from a price and technical standpoint which the offeror can submit to the Government." (emphasis added). Accordingly, the Court finds that the "Four-Step" procurement procedures of DAR 4–107 and DOD Directive 4105.62 are not applicable to the T–ARC 7 procurement. Therefore, the T–ARC 7 procurement falls within III.D.6. of DOD Directive 4105.62 which states: "Except for those covered by ¶ III.D.5., all proposals received shall be evaluated, and *except where the exceptions in ASPR 3–805.1 . . . are applicable,* discussions shall be held in accordance with ASPR 3–805.3. The competitive range shall be determined in accordance with ASPR 3–805.2." (emphasis added). *Accord,* DAR 4–107.2 ("Acquisition for which these procedures are not used shall follow the procedures of [DAR] 3–805."). Thus, the T–ARC 7 procurement is expressly subject to the "adequate com-

petition" exception to the requirement of discussions. DAR 3–805.1. The Court will now consider whether the Navy properly invoked that exception here.

E. *Discussions and Best and Final Offers*

Plaintiffs challenge the Navy's decision to award the T–ARC 7 contract on the basis of initial proposals without holding a round of "discussions" and requesting the submission of "best and final offers" as provided in DAR 3–805.1.–3. As indicated above, defendants contend the Navy properly invoked an exception to these requirements. The facts material to the issue of the applicability of the exception are not genuinely in dispute. For the reasons set forth below, the Court grants summary judgment to defendants on this issue.

Title 10 of the United States Code, § 2304(g) and regulations promulgated thereunder expressly exempt from the requirement of "discussions" those procurements in which (1) "it can be clearly demonstrated from the existence of adequate competition . . . that acceptance of an initial proposal without discussion would result in fair and reasonable prices," (2) "where the request for proposals notifies all offerors of the possibility that award may be made without discussion," [15] and (3) "award is in fact made without any written or oral discussion with any offeror." [16] If "discussions" do occur, the requirement of an opportunity to submit "best and final" offers is triggered. DAR 3–805.3(d).

### 1. *"Adequate competition"*

It is clear to the Court that the Navy rationally determined that all six offerors were in the competitive range and had a reasonable chance of being selected for award of the T–ARC 7 contract. The procurement record establishes beyond dispute that, in the Navy's judgment, six proposals from major shipbuilding firms gave rise to a highly competitive situation. *See* Jt.Ex. V, p. 5. Under such circumstances, the

Court concludes that the highly discretionary competitive-range determination was rationally made by the Navy. DAR 3–805.-2(a). The Court finds it obvious that "adequate competition" for the T–ARC 7 contract existed in light of the highly competitive situation created by the six T–ARC 7 proposals. *See* DAR 3–807.1(b)(1).

The Navy's finding of competition adequate to forego "discussions" is not precluded, as plaintiffs argue, by its citation of 10 U.S.C. § 2304(a)(10) as authority to use a negotiated procurement rather than formal advertising. *See* Jt.Ex. W. Section 2304(a)(10) provides for negotiated procurement where the contract "is for property or services for which it is impracticable to obtain competition." As the Comptroller General has held, invocation of this provision does not "presuppose an absence of adequate competition, since that exception merely states that competition by means of the preferred method of formal advertising is impracticable." *Dynalectron Corp., supra* at 349–50.

### 2. *The RFP Notification*

It is beyond dispute that the RFP for the T–ARC 7 procurement notified all offerors of the possibility that award may be made without discussion as required by 10 U.S.C. § 2304(g) and DAR 3–805.1(v). *See* Jt.Ex. B, p. 15.

### 3. *The Absence of "discussions"*

"Discussions" is a term of art in the Defense Acquisition Regulations. There exists no specific definition of the term in the applicable statutes or regulations. However, DAR 3–805.3 contemplates "discussions" as communications with offerors relating to "deficiencies." A "deficiency" is defined as "that part of an offeror's proposal which would not satisfy the Government's requirements." DAR 3–805.3(a). Equity demands that, if one offeror is notified of such "deficiencies" and allowed to revise its proposal, all offerors must be af-

---

**15.** 10 U.S.C. § 2304(g) (1976); *Accord,* DAR 3–805.1(v).

**16.** DAR 3–805.1(v).

forded an equal opportunity to revise their proposals. Thus, in determining whether a communication between an agency and an offeror constitutes a "discussion" triggering a requirement for a full round of "discussions" with all offerors, the controlling test is whether an offeror was given an opportunity to modify its proposal as a result of the communication.[17]

Plaintiffs claim that "discussions" with offerors did, in fact, occur. Specifically, plaintiffs contend the following constitute "discussions" which would trigger the requirement of a full round of discussions and an opportunity to submit best and final offers:

1) the pre-award surveys

2) the audits conducted by the Defense Contract Audit Agency

3) the Cost Realism Conferences

4) the Navy letters of March 8, 1979, and May 31, 1979.

### a. *The Pre-Award Surveys.*

It is undisputed that pre-award surveys were conducted and that some communications between members of the survey team and representatives of the offerors necessarily occurred. The regulations governing such surveys provide: "[T]he solicitation shall be discussed with prospective contractors to assure that they understand its requirements, including its technical aspects such as drawings, specifications . . . ." DAR, App. K, ¶ K–303.1(b)(2). Were such communications deemed "discussions" within the meaning of DAR 3–805.1, the express exceptions to the requirement for discussions and best and final offers would automatically be inapplicable whenever on-site pre-award surveys were performed. Such a result would be anamolous since pre-award surveys are intended to be used for the purpose of determining whether an offeror is "responsible" and capable of performing the contract. *See* DAR 1–905.4(a). Indeed, the Comptroller General has held that communication to determine an offeror's "responsibility" does not constitute "discussions" within the meaning of DAR 3–805.3. In *Hercules, Inc.*, B–167643 (November 14, 1969), the Comptroller General concluded:

> [A]n offeror's responsibility or ability to perform may be discussed without foreclosing the right of the contracting officer to invoke the exception to the requirement for conducting written oral discussions. Any other conclusion would either deprive the Government of the right to make an award on the basis of initial proposals or allow such an award only at the peril of dealing with nonresponsible contractors.

The Court concludes that the term "discussions" must be interpreted to preserve the consistency of a regulatory scheme that authorizes an agency to make awards on the basis of initial proposals and also requires the agency to make awards only to responsible offerors. Accordingly, the Court finds that the preaward surveys conducted in the T–ARC 7 procurement did not constitute "discussions" within the meaning of DAR 3–805.3.

### b. *The DCAA Audits.*

DCAA audits, like pre-award surveys, often involve communications with the offerors. DAR 3–801.5(b)(7) provides that the auditor be given access to the offer's "books and accounting records" and that the offeror is to have "the opportunity of presenting his views" to the contracting officer concerning any accounting inadequacies found by the auditor. DAR 3–801.5(b)(9) provides for further discussions between offeror representative and auditor.

Again, the Court is compelled to conclude that, to preserve the consistency of the regulatory scheme which authorizes an agency to make awards on the basis of initial pro-

---

17. *Group Hospital Services, Inc.*, B–190401, 58 Comp.Gen. 263, 274 (1979); *Airco, Inc. v. ERDA*, 528 F.2d 1294 (7th Cir. 1975) (per cu-riam); *General Electric Co. v. Kreps*, 456 F.Supp. 468, 473 (D.D.C.1978).

posals and also provides procedures to insure contract awards based on realistic cost proposals, the term "discussions" within the meaning of DAR 3–805.3 does not include authorized audits.

Moreover, the T–ARC 7 procurement record discloses no instance in which an offeror modified or revised its proposal in the course of, or as a result of, a DCAA audit. Accordingly, the Court concludes that the DCAA audits conducted on the offerors' T–ARC 7 proposals do not constitute "discussions" within the meaning of DAR 3–805.3.

### c. The Cost Realism Conferences.

The Cost Realism Team began its review upon submission of the cost proposals on April 5, 1979. In developing its evaluation: "[T]he Cost Realism Team worked primarily from the data furnished by the offerors in their cost and Technical/Management proposals, supplemented by data from recent and on-going audits, information available within the Command, and interviews with all offerors." Jt.Ex. S, p. 1. The "interviews with all offerors" referred to were the Coast Realism Conferences, which took place shortly after the cost proposals were submitted. The conferences entailed unilateral presentations by the offerors to explain the basis of elements of their proposals, but did not afford any offeror any opportunity to revise its proposal. As such, the conferences do not constitute "discussions" within the meaning of DAR 3–805.3. *Sellers, Conner & Cuneo*, B–176182, 52 Comp.Gen. 358 (1972).

### d. The Navy Letters of March 8 and May 31, 1979.

During its preliminary evaluation of the technical/management proposals, the SSEB determined that additional information was needed to clarify specific areas of each proposal. *See* Jt.Ex. V, p. 4. Accordingly, on March 8, 1979, the contracting officer notified each offeror by letter that the necessary items of information should be submitted by March 15, 1979. *See* Jt.Exs. E–J. The Navy used the same transmittal text for each letter, although the information requested of the specific offeror varied. The information requested dealt primarily with such matters as resumes of key personnel and breakdown of certain labor and man-day estimates. Each of the offerors supplied the requested information by return letter. See Jt.Exs. K–P. There is no dispute that the SSEB relied on the requested information in its evaluation of the offerors' proposals. *See* Jt.Ex. V, p. 4.

DAR 2–405(ii) specifically includes an offeror's "failure to furnish required information concerning the number of bidder's employees" within the category of "minor informalities and irregularities." [18] and DAR 3–805.5(b) provides that "communications with offerors required to resolve [minor information and irregularities] shall not be considered discussions within the meaning of this paragraph 3–805." The Court concludes that, pursuant to DAR 2–405 and 3–805.5(b), the Navy's letters of March 8, 1979, and the offeror's responses thereto involved "minor informalities and irregularities" and did not constitute discussions within the meaning of DAR 3–805.3. The Court views the requested information as clarifying in nature and can perceive no prejudicial effect to any offeror resulting from its submission to the SSEB.

On May 31, 1979, the Navy sent a letter [19] to plaintiff Sun Ship stating that "your cost proposal . . . does not contain any amount representing the Facilities Capital Cost of Money" and requesting Sun Ship to

---

18. DAR 2–405 defines "a minor informality or irregularity" as "merely a matter of form or is some immaterial variation from the exact requirements of the invitation for bids, having no effect or merely a trivial or negligible effect on price, quality, quantity, or delivery . . . or performance."

19. Attachment G to Sun Ship's October 2, 1979, protest letter to the General Accounting Office, which appears as an attachment to Sun Ship's Complaint in this action, filed October 15, 1979.

1374

"clarify whether or not you intend to charge the Government" for that cost. The letter further stated: "Please be advised that should you intend to [charge the Government] and modify your cost proposal, the Government's evaluation of your total cost to perform would be increased to take that into account." Sun Ship's response letter of June 7, 1979, stated that "Sun Ship does not intend to charge the Government." [20]

DAR 3–805.5(d)(1) provides: "If the contracting officer suspects a mistake, he shall advise the offeror and request verification. If the offeror verifies his proposal, award may be made. This procedure shall not be considered "discussions" within the meaning of this paragraph 3–805." The Navy's letter of May 31, 1979, to Sun Ship and the response thereto are clearly within the verification procedures of DAR 3–805.5(d)(1). To allow the Navy's use of the word "modify" to control is to allow form to control substance. Accordingly, the Court concludes that no "discussion" within the meaning of DAR 3–805.3 occurred by reason of the May 31, 1979, letter to Sun Ship and the response thereto.

On May 31, 1979, the Navy also sent a letter to NASSCO which stated in part: "[T]he purpose of this letter is to request clarification from [NASSCO] on what alternative facilities would be used in the event the Government-owned drydock # 1 is unavailable for the T–ARC 7 program, and what modifications, if any, would be required to your proposal as a result thereof." Jt.Ex. K–10. NASSCO's response, by letters dated June 4 and June 26, 1979, was if NASSCO were ultimately required to utilize alternative drydock arrangements, it would entail a "very minor" incremental cost, estimated to be approximately $45,-000.00.

The Court concludes that the Navy's letter and NASSCO's response thereto were purely clarifying in nature. NASSCO was not accorded the opportunity to revise its proposal and did not submit any modification or revision. The Navy merely asked what modification *would be required if* the Government-owned drydock # 1, in San Diego, California, were unavailable after July 2, 1981. The unavailability of the drydock was uncertain and it was reasonable for the Navy to make an inquiry regarding this uncertainty. The Court can perceive no prejudicial effect on any offeror resulting from the information submitted to the Navy in response to the Navy's inquiry since the SSAC determined that all the offerors' facilities were "significantly above the threshold required for the T–ARC 7 program" Jt.Ex. V, p. 25. Moreover, the availability of drydock facilities is pertinent to NASSCO's "responsibility" or ability to perform the contract, and communications relating to the responsibility of an offeror do not constitute "discussions". *Hercules Corp., supra.*

In sum, the Court finds that the Navy letters of March 8, 1979, and May 31, 1979, and the respective responses thereto do not constitute "discussions" within the meaning of DAR 3–805.3.

In accordance with the foregoing, the Court concludes that the Navy properly invoked 10 U.S.C. § 2304(g) and DAR 3–805.-1(v) in support of its determination to award the T–ARC 7 contract on the basis of initial proposals.

## IV. CONCLUSION

In accordance with the foregoing, the Court concludes: 1) that the Navy's decisions with regard to the T–ARC 7 procurement did in fact have a rational basis, and 2) the T–ARC 7 procurement procedure did not involve any clear and prejudicial violations of applicable statutes or regulations. Therefore, defendants' motion for summary judgment in this action is granted and this case is dismissed. An order in accordance with the foregoing will be issued of even date herewith.

20. Attachment H to Sun Ship's protest letter to the General Accounting Office.