**BLUE CROSS AND BLUE SHIELD OF MARYLAND, INC., Plaintiff,**

v.

**UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, Defendant.**

**Civ. A. No. 89–1260.**

United States District Court, District of Columbia.

July 17, 1989.

Caryl A. Potter, III, Elizabeth A. Ferrell, Piper & Marbury, Washington, D.C., for plaintiff.

John M. Facciola, Asst. U.S. Atty., Washington, D.C., for defendant.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

In this action for declaratory and injunctive relief, plaintiff Blue Cross and Blue Shield of Maryland, Inc. ("Maryland") challenges the award of a contract to Empire Blue Cross and Blue Shield ("Empire") by defendant United States Department of Health and Human Services, Health Care Financing Administration ("HCFA") for the maintenance and enhancement of the Medicare Common Working File ("CWF") system, a data file containing Medicare beneficiary information. Maryland claims that the selection of Empire was improper because defendant did not evaluate the submitted proposals in accordance with the criteria set forth in the solicitation document. The matter now comes before the Court on the parties' cross-motions for summary judgment, the oppositions, replies, and the numerous surreplies and responses thereto.[1] For the reasons stated below, plaintiff's motion is granted and defendant's motion is denied.

## I. BACKGROUND

Medicare is a program under which the Government provides health care benefits to the aged and disabled. The Medicare Act, 42 U.S.C. § 1395, *et seq.*, establishes two parts of the Medicare Program. Part A provides for basic hospital and other institutional and home health services and is administered under agreements with organizations known as "Intermediaries." 42 U.S.C. § 1395h. Part B is a voluntary supplemental program providing reimbursement for the covered services of physicians and other health care professionals, and medical supplies and equipment and is administered by organizations known as "Carriers." 42 U.S.C. § 1395u(f).[2]

The Health Care Financing Administration is the agency within the Department of Health and Human Services which is responsible for the administration of Medicare. The HCFA currently has contracts with both Maryland and Empire as "Carriers" under Part B of the Medicare Program. Empire administers Part B in a large portion of the State of New York under a contract entered into on October 1, 1987. Maryland administers Part B for most of the State of Maryland under a contract entered into on October 1, 1987. Both contracts have expiration dates of September 30, 1989.[3] By a Memorandum of Understanding dated September 30, 1987, and an amendment to Maryland's Part B Carrier Contract of October 1, 1987, Maryland undertook the development, installation, and initial implementation of the Common Working File ("CWF") system on a pilot basis.[4]

---

1. Plaintiff originally filed a motion for preliminary injunction. By agreement of all parties and the Court, this motion was converted to and treated as a motion for summary judgment so that final disposition of the matter could be reached. *See* Order, May 26, 1989. Defendant thereafter filed a cross-motion for summary judgment and the parties subsequently filed their responsive pleadings.

2. *See* Declaration of Marilyn Koch, Director, Office of Program Administration with the Health Care Financing Administration ("Koch Decl."), ¶ 3.

3. *Id.* ¶¶ 4–5. Maryland and Empire also administer Part A of the Medicare Program in various locations. *Id.*

4. *Id.* ¶ 6. The Common Working File is a computerized database for maintaining Medicare beneficiary information for persons within an assigned geographical area. Plaintiff's Statement of Material Facts Not in Dispute for Purpose of Summary Judgment, ¶ 4. Under this system, host sites will be established which will be responsible for maintaining complete Medicare beneficiary claims processing information for beneficiaries within their assigned geographical area. That information will be provided to Medicare Intermediaries and Carriers in order to improve the accuracy and timeliness of the processing of Medicare claims. Under the current system, each Intermediary and Carrier maintains individual beneficiary payment records, which is less efficient and results in payment errors. The CWF is designed to improve the processing of Medicare claims because it will reduce payment errors and provide updated entitlement and eligibility data on Medicare beneficiaries. Declaration of John Van Walker, Director of the Divisional Operational Systems Development, Office of Program Operations Procedures, of the Health Care Financing Administration ("Van Walker Decl."), ¶ 2.

On September 30, 1988, defendant issued Proposal Submission Requirement number 88–04–A, B ("PSR") to solicit proposals for the maintenance and enhancement of the Medicare CWF system. The solicitation was made only to existing Medicare Intermediaries and Carriers. The PSR stated that the proposals would be evaluated in three major areas: technical, experience, and cost, in descending order of importance.[5] The PSR also stated that the award would be made to the offeror whose proposal was technically acceptable and whose technical/experience/cost relationship was the "most advantageous to the Government."[6] Six proposals were received by the closing date of November 28, 1988. On December 20, 1988, defendant established a competitive range of three offerors, including Maryland and Empire. Best and Final Offers ("BAFO") were submitted on January 18, 1989. The three offers were rated as follows[7]:

|            | Maryland | Empire | Arizona |
|------------|----------|--------|---------|
| Technical  | 486      | 449    | 500     |
| Experience | 258      | 300    | 246     |
| Cost       | 193      | 200    | 167     |
| Total      | 937      | 949    | 913     |

On February 3, 1989, defendant awarded the CWF maintenance and enhancement contract to Empire. By letter dated February 21, 1989, Maryland filed a protest with the General Accounting Office ("GAO") challenging the award to Empire as inconsistent with the express evaluation factors set forth in the PSR. As a result of this protest, defendant suspended performance of the contract by Empire on March 1, 1989. The contracting officer then sought and obtained approval from the HCFA on March 22, 1989, pursuant to 48 C.F.R. § 333.104(c), to proceed with the contract to Empire notwithstanding the pending protest at the GAO.

Maryland filed the instant complaint on May 8, 1989 seeking (1) a declaration that the contract award to Empire was contrary to applicable law, (2) an injunction preventing Empire from performing the contract, and (3) an order terminating the contract between defendant and Empire.[8]

## II. DISCUSSION

### A. Standard of Review

The applicable standard of review in this case, as stated by our court of appeals, requires that Maryland, as a disappointed bidder,

> bear[s] a heavy burden of showing either that (1) the procurement official's decisions on matters committed primarily to his [or her] own discretion had no rational basis, or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations.

*Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C.Cir.1973). This deferential standard requires that "[s]o long as there is a reasonable basis for an agency's action in matters involving procurement, 'the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'" *Prudential–Maryland Joint Venture Co. v. Lehman*, 590 F.Supp. 1390, 1401 (D.D.C.1984) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C.Cir.1971)). This standard is a restatement of the standard of review set forth in the Administrative Procedure Act which provides that a reviewing court may hold unlawful and set aside agency action which is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). *Choctaw Manufacturing Co., Inc. v. United States*, 761 F.2d 609, 616 (11th Cir.1985).

---

5. Memorandum of Points and Authorities in Support of Plaintiff's Motions for Preliminary Injunction and Expedited Discovery, Exhibit 1 ("PX–1"), p. 12.

6. *Id.*

7. PX–5.

8. On May 16, 1989, due to the initiation of the instant lawsuit, the GAO dismissed Maryland's pending protest pursuant to its bid protest rules. Defendant's Statement of Material Facts as to Which There is no Genuine Dispute, ¶ 52.

As previously observed, the PSR provided that the proposals would be evaluated on three distinct criteria: technical, experience, and cost. Plaintiff originally claimed that defendant improperly evaluated both the cost and experience factors in violation of applicable procurement law. However, based on the revelations made by defendant in its subsequent pleadings and submissions to the Court as to the basis for its award of the contract to Empire, plaintiff has abandoned its argument as to the experience factor of its proposal,[9] and now bases its claim on two separate grounds. First, Maryland claims that the HCFA improperly evaluated the cost proposals in violation of the applicable law and procurement regulations. Second, Maryland challenges, as contrary to established procurement law, defendant's application of a "tie-breaking" factor that was not included in either the PSR or the BAFOs. Both arguments are based, in whole or in part, on defendant's asserted justification for awarding the contract to Empire.[10]

Although Empire's proposal received a rating of 949, twelve points higher than Maryland's rating of 937, the HCFA claims that it treated the two proposals as essentially equal. The HCFA asserts that it then applied a "tie-breaking" factor to determine which of the two offerors should be awarded the contract. The submissions to the Court reflect otherwise. In her affidavit, attached to defendant's opposition to plaintiff's motion for preliminary injunction, Barbara J. Gagel, the Government Contracting Officer for the Medicare Intermediary and Carrier Contracts who was responsible for selecting Empire over Maryland, explains her decision as follows:

> That decision [to select Empire to perform the CWF maintenance services] was based upon my consideration of the information provided to me by my staff concerning the proposals that were submitted by existing Medicare Intermediaries and Carriers, including Blue Cross and Blue Shield of Maryland (BCBSM).
>
> I determined that Empire's proposal was technically acceptable and offered the most advantageous technical/experience/cost relationship to the Government. In making that decision, it was my view that the proposals submitted by Empire and BCBSM were *technically* equal, but that the Empire cost proposal was more advantageous to the Government because, over the life of the contract, Empire's cost would be less to perform additional work which will be necessitated by legislative and programmatic changes.

Declaration of Barbara J. Gagel ("Gagel Decl."), ¶¶ 3–4 (emphasis added). It was not until a subsequent pleading that defendant's counsel posited the "tie-breaker" theory:

> Once the scoring of the two proposals was revealed to be essentially equal, the selecting official then considered as a "tie-breaking" factor, the financial savings derived from Empire's offer to provide the CPU [central processing unit] usage at no cost for any *future* additional work based on legislative and programmatic changes. The last page of the materials at Tab 13 of the Administrative Record confirms that Empire will

---

**9.** *See* Plaintiff's Reply in Support of its Motion for Summary Judgment and Opposition to Defendant's Cross–Motion for Summary Judgment, p. 4.

**10.** As a preliminary matter, the Court rejects defendant's argument that this Court is without subject matter jurisdiction over the instant complaint. Defendant maintains that this action does not involve the loss of a contract, as would normally be the case in a disappointed bidder's suit, but instead stems from HCFA's decision to *modify its existing carrier contract with Empire* rather than its existing contract with Maryland, to perform the CWF maintenance function. Defendant therefore characterizes this action as a contract dispute under the Contract Disputes Act of 1978, 41 U.S.C. § 601 *et seq.*, which belongs in the United States Claims Court. Defendant's assertions are rebutted not only by the *Federal Acquisition Regulation's* definition of "contract," which includes bilateral contract modifications, *see* 48 C.F.R. § 2.101, but the PSR itself, which clearly defines any modification of an existing carrier contract as a "contract." *See* PX–1, at 1. It therefore strains reason to construe this suit as anything other than a disappointed bidder suit which Maryland is entitled to bring in the United States District Court under *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859 (D.C.Cir.1970) and its progeny.

not charge HCFA for the cost of CPU usage either for performing the existing scope of work, or for performing any additional work.

Since the CWF maintenance effort involves the maintenance of the CWF system and software, the cost of computer time, or CPU usage, will be a significant element of cost. It is common knowledge that the nature of the Medicare program is not static; rather, the program is one that is constantly changing, either as a result of Congressional oversight or executive direction. Hence, it was reasonable for the selecting official to break the tie between the two proposals by relying on Empire's agreement not to charge HCFA for CPU usage for future legislative or programmatic changes as a factor which will result in considerable savings to the Government.

Defendant's In Camera Memorandum of Law, pp. 2–3 (emphasis in original).

■ Despite the argument of counsel that the proposals were treated as essentially equivalent due to the narrow twelve point difference in overall points awarded (Empire–949, Maryland–937), the affidavit of Barbara Gagel, the individual who actually selected Empire over Maryland, makes clear that she did not consider the proposals to be equivalent overall; rather, she determined that the *technical* scores were essentially equal. She reached this conclusion despite the fact that Maryland received a score of 486 for its technical proposal while Empire received a score of 449 for its technical proposal. Yet she offers absolutely no basis for this decision, which in effect penalized Maryland by 37 points in the category that was to be given the most weight. The Court cannot give deference to the post-award "tie-breaker" rationalization made by defendant's counsel when the declaration of Barbara Gagel, the HCFA official responsible for the selection of Empire over Maryland, directly contradicts it. Because Gagel offers no explanation for treating the technical proposals as equivalent despite the 37 point disparity, the Court is unable to assess the propriety or rationality of Gagel's decision, and the matter must be remanded to the HCFA for further explanation.

Although the Court would be justified in granting Maryland's motion for summary judgment on this basis alone, Maryland has raised a number of other arguments which the Court shall now address so that the HCFA understands what further action will be required of it upon remand of this matter.

## B.  Evaluation of the Cost Proposals

Maryland first challenges defendant's asserted justification for awarding the contract to Empire. Maryland claims that despite defendant's argument that it only considered the savings on CPU usage for "future legislative or programmatic changes" *after* it determined that the proposals were tied, defendant actually took these future savings into account in determining that a tie existed in the first place; that is, defendant's award of the maximum 200 points to Empire for its cost proposal was based on consideration of the future savings based on CPU usage. Had defendant properly evaluated the cost proposals, Maryland believes that it, rather than Empire, would have been awarded the maximum 200 points in that area which would have resulted in a higher overall score and an award of the contract to Maryland. If this was indeed the case, then defendant violated established procurement law which prohibits the application of evaluation criteria not listed in the solicitation document.[11]

---

**11.**  Plaintiff points to 41 U.S.C. § 253b(a), which provides:

An executive agency shall evaluate the sealed and competitive proposals based solely on the factors specified in the solicitation.

Additionally, plaintiff cites 48 C.F.R. § 315.406–5(c)(ii), which provides:

The finalized evaluation criteria and indications of their relative importance or weights, as included in the RFP, cannot be changed except by a formal amendment to the RFP issued by the contracting officer. No factors other than those set forth in the RFP shall be used in the evaluation of proposals.

Finally, plaintiff cites 48 C.F.R. § 15.608(a), which provides:

Proposal evaluation is an assessment of both the proposal and the offeror's ability (as con-

Maryland's argument is buttressed by that portion of Gagel's declaration in which she states that she viewed Empire's and Maryland's proposals as technically equal, but that Empire's cost proposal was more advantageous to the Government because, "over the life of the contract, Empire's cost would be less to perform additional work which will be necessitated by legislative and programmatic changes." Gagel Decl. ¶ 4. The summary of the evaluation of Empire's cost proposal, entitled "Best and Final Cost Analysis—Empire Blue Cross", is further evidence that the HCFA took these future cost savings into account in the original evaluations of the cost proposals rather than *after* its determination that the overall proposals were tied. That summary, which outlines the reasons for Empire's cost proposal score, states:

No CPU hours and cost will be charged to this procurements [sic] *or any future CWFM workloads.*

Administrative Record, Vol. 1, Tab 28 (emphasis added). These portions of the record suggest that the HCFA did consider these future savings in its original evaluation of the offerors' cost proposals. Once again, however, given the brevity and ambiguity of the Gagel Declaration, the sole document which attempts to explain the HCFA's decision, the Court is unable to discern whether this was in fact the case and if so, how much weight Gagel assigned to this element of cost.

Plaintiff's second argument is that since it had a lower cost total "capped" cost,[12] any point system which would award a higher point total to Empire for the cost element of the proposals would be irrational because the Government's interest is to achieve the lowest *actual* dollar cost for the work specified rather than the highest number of subjective evaluation points.

The award of a cost-reimbursement contract such as the instant one is governed by 48 C.F.R. § 15.605(d), which provides:

In awarding a cost-reimbursement contract, the cost proposal should not be controlling, since advance estimates of cost may not be valid indicators of final actual costs. There is no requirement that cost-reimbursement contracts be awarded on the basis of lowest proposed cost, lowest proposed fee, or the lowest proposed cost plus fee. The award of cost-reimbursement contracts primarily on the basis of estimated costs may encourage the submission of unrealistically low estimates and increase the likelihood of cost overruns. The primary consideration should be which offeror can perform the contract in a manner most advantageous to the Government, as determined by evaluation of proposals according to the established evaluation criteria.

In the instant case, the cost evaluation scheme as set forth in the PSR states that:

The "total cost" used in the evaluation process will include implementation, testing and documentation, the maintenance cost for each year period, and all other costs whether to be incurred by the offeror or caused by the offeror to be incurred by third parties, e.g., the Government.

The proposal rated highest in the cost section of the evaluation will be awarded maximum points. Other proposals will be awarded points for cost on the basis of how their proposed cost compared to the highest rated proposal.

PX–1, at 14. Plaintiff claims that defendant's use of any internal price evaluation approach other than the "total cost" approach set forth above was contrary to applicable case law and federal statute which prohibits the evaluation of proposals based on criteria not specified in the solicitation.[13] Defendant maintains that it did

---

veyed by the proposal) to successfully accomplish the prospective contract. An agency shall evaluate competitive proposals solely on the factors specified in the solicitation.

**12.** Maryland's capped cost was $1,180,540; Empire's capped cost was $1,499,783. *See* Administrative Record, Vol. 8, Tab 14, at 14–15, Tab 15, at 12–13; Vol. 1, Tab 28.

**13.** *See, supra,* n. 11; *see also, National Capital Medical Foundation, Inc.,* Comp.Gen. B–215303.-5, June 4, 1985 ("it is improper for an agency to depart, in a material way, from the evaluation plan described in the RFP without informing the offerors and giving them an opportunity to structure their proposals with the new evaluation scheme in mind").

not stray from the evaluation criteria of the PSR. According to defendant, the above language from the PSR indicates that all elements of cost would be examined, rather than just the total "capped" costs, in order to determine which proposal would be "most advantageous to the Government."

■ Not only does 48 C.F.R. § 15.605(d) provide authority for defendant's assertion, but in response to a question at a pre-proposal conference concerning whether the lowest cost would be awarded the highest rating, an HCFA representative stated that it would be possible that the lowest proposed cost would not receive the highest rating. Rather, the relationship among the various cost elements of the proposals and cost reasonableness would be the guiding principles used by the evaluators.[14] The offerors were therefore clearly on notice that the "capped" cost proposals would not be the determinative factor and that the lowest "capped" cost would not necessarily receive the maximum point award. Defendant's use of the "total cost" approach, as set out in the PSR and clarified by the responses at the pre-proposal conference, therefore appears to be rational.[15]

## C. The "Tie–Breaking" Factor

Even had the Court not concluded that the HCFA improperly determined that the overall proposals were equivalent and thereafter applied a "tie-breaking" factor, substantial improprieties and violations of applicable law and regulation exist which would warrant summary judgment in favor of Maryland.

Maryland first claims that defendant's application of the "tie-breaking" factor was contrary to established procurement law which requires that in making an award decision, an agency may not consider offers made after the date for receipt of BAFOs; rather, evaluation and award must be based solely upon information contained in the BAFOs.[16]

Although defendant states that the "tie-breaking" factor was Empire's agreement not to charge the HCFA for CPU usage for future legislative or programmatic changes, this agreement is not stated anywhere in Empire's BAFO. Rather, the offer was made by Empire on January 20, 1989, two days *after* the submissions of all BAFOs, during a telephone conversation with Irvin Robinson, Selection Coordinator of the HCFA. A letter dated January 20, 1989 from Harvey W. Friedman of Empire to Robinson confirmed the substance of that conversation:

> This will confirm our telephone conversation today clarifying the need for incremental CPU costs for the CWFM.

Defendant has stated that the point system provided a reliable assessment of the Government's cost risks for each offeror over the life of the CWF maintenance efforts. Because the bidder awarded the contract was to be reimbursed for its actual costs, subject to a cost limitation, defendant states that it was necessary to do more than merely compare the capped cost proposals submitted by the offerors.

The Court will not second guess the HCFA's Proposal Evaluation Plan. Decisions as to point allocation and the proper weight to be assigned to the various cost elements are matters within the discretion of the HCFA, to which this Court must give due deference.

---

**14.** *See* Administrative Record, Vol. 1, Tab 4, at 18–19.

**15.** The Court also rejects Maryland's argument that the point system utilized by defendant disproportionately favors the most insignificant cost elements in the proposals. Plaintiff has demonstrated that for the two most significant cost elements, salary and fringe, plaintiff only received 20 "points" more than Empire for a real costs savings of $314,192. By contrast, for the four most insignificant cost elements, postage, supplies, miscellaneous, and outside professional services, Empire received 20 points more than Maryland for a real cost savings of only $11,107. Furthermore, Empire was awarded 100 points more than Maryland for the cost for CPU hours which reflected a real cost savings of $68,260; Maryland, on the other hand, was only awarded 20 points more than Empire for a cost savings of $314,192 in salary and fringe. Based on these figures, Maryland claims that defendant's point system distorts the reality of the actual lowest cost and is therefore irrational.

**16.** *See* 41 U.S.C. § 253b; 48 C.F.R. § 15.608(a); 48 C.F.R. § 315.406–5(c)(1)(ii), 48 C.F.R. § 315.406(a); *see also Keystone Engineering Co.,* Comp.Gen. B–228026, Nov. 5, 1987, 87–2 CPD ¶ 449; *Bromma, Inc.,* Comp.Gen. B–225663, May 6, 1987, 87–1 CPD ¶ 480); *Menasco, Inc.,* Comp. Gen. B–223970, Dec. 22, 1986, 86–2 CPD ¶ 696.

There will be no incremental CPU costs associated with the CWFM as we now understand that effort or for additional requirements which may be requested subsequently.

Administrative Record, Tab 13, last page. Defendant claims that this letter "did not constitute a new offer ... nor provide any information not already presented to HCFA in Empire's best and final offer. Rather, the letter was simply a minor clarification of Empire's best and final offer, which was permissible under existing procurement law ..."[17] The Court disagrees.

48 C.F.R. § 15.601 defines "clarification" as follows:

"Clarification," as used in this subpart, means communication with an offeror for the sole purpose of eliminating minor irregularities, informalities, or clerical mistakes in the proposal. It is achieved by explanation or substantiation, either in response to Government inquiry or as initiated by the offeror. Unlike discussion (see definition below), clarification does not give the offeror an opportunity to revise or modify its proposal, except to the extent that correction of apparent clerical mistakes results in a revision.

In contrast, "discussions" occur if an offeror is afforded an opportunity to revise or modify its proposal, or when information requested from and provided by an offeror is essential for determining the acceptability of the firm's proposal. *See Menasco, Inc.,* Comp.Gen. B–223970, Dec. 22, 1986, 86–2 CPD ¶ 696. The distinction is crucial, for "[w]hen an agency conducts discussions with one offeror, it must conduct discussions with all offerors in the competitive range and afford them an opportunity to revise their proposals." *Id.* (citing *Greenleaf Distribution Services, Inc.,* Comp.

Gen. B–221335, April 30, 1986, 86–1 CPD ¶ 422); *see also, Alchemy, Inc.,* Comp.Gen. B–207338, June 8, 1983, 83–1 CPD ¶ 621; *Bromma, Inc.,* Comp.Gen. B–225663, May 6, 1987, 87–1 CPD ¶ 480); *Keystone Engineering Co.,* Comp.Gen. B–228026, Nov. 5, 1987, 87–2 CPD ¶ 449.

Empire's subsequent communication and agreement with the HCFA to not charge for future CPU costs can only be properly characterized as a "discussion" rather than a "clarification." The record does not reflect that Empire submitted that information in order to eliminate a clerical error or *minor* irregularity in its original proposal. Rather, it appears that by a telephone conversation and confirming letter, Empire submitted information to persuade the HCFA, after bids were closed, that its proposal would be more advantageous to the Government. By accepting this information from Empire and engaging in these *ex parte* communications without affording the other offerors in the competitive range an opportunity to revise their proposals, the HCFA violated established procurement law.[18]

Nothing in *Sun Ship, Inc. v. Hidalgo,* 484 F.Supp. 1356 (D.D.C.1980), upon which defendant relies, compels a contrary result. In that case, an unsuccessful bidder challenged the selection official's use of unannounced criteria to break a tie between equivalent proposals for a contract with the Department of the Navy. Faced with a tie between two offerors in both the technical/management and cost criteria, the selection advisory council applied five additional factors in an attempt to determine which proposal would be of the greatest value to the Government. The Court upheld the application of the unannounced criteria as "rationally related to the speci-

---

**17.** Defendant's Reply to Plaintiff's Reply in Support of its Motion for Summary Judgment and Opposition to Defendant's Cross–Motion for Summary Judgment, at 12–13.

**18.** The logical inconsistency in defendant's arguments is noteworthy. Here, defendant argues that Empire had already submitted this information in its BAFO. Yet previously, defendant argued that its evaluation of Empire's cost proposal was based solely upon Empire's offer not

to charge the government for CPU usage for the *existing* scope of work. Defendant cannot have it both ways. Either Empire did submit the information originally, in which case defendant improperly evaluated the cost proposals on criteria not contained in the PSR, or Empire did *not* submit the information originally, in which case defendant considered matters not contained in the BAFOs. Either way, defendant violated established procurement law.

fied goal of obtaining the contract that will be the most advantageous to the Government, price and other factors considered." *Id.* at 1369. In reaching this decision, the Court quoted the following language of the Comptroller General:

> When ... competing proposals are measured against the evaluation factors established for the procurement and the selection official, in the good faith exercise of the discretion vested in him, is unable to discern an appropriate choice on the basis of that evaluation, we think that the official properly may take into account other factors which are rationally related to a selection decision for the particular procurement involved.

*Group Hospital Service, Inc.,* 58 Comp. Gen. 263, 270 (1979). *Sun Ship* is not persuasive here, where defendant's alleged application of the "tie-breaking" factor violated applicable procurement law. Applying a tie-breaking factor which was based on information obtained through *ex parte* discussions with one of the offerors in the competitive range after the filing of BAFOs and without giving the other offerors an opportunity to respond, can hardly be called rational.[19] Had the HCFA given Maryland the same (equal) opportunity, it *may* have been able to establish that its proposal, rather than Empire's, was most advantageous to the Government.[20]

██  Next, Maryland claims that application of the "tie-breaking" factor violates established procurement law which prohibits using speculative factors as a basis for evaluation of bid proposals.[21] The Court agrees. Defendant admits that the amount of these "legislative and programmatic changes" was not and is not known to the HCFA.[22] Nevertheless, defendant asserts that changes in the Medicare program in the future are a virtual certainty and that CPU usage costs will be a significant component of the costs related to those changes. In making this argument, defendant not only fails to show that the changes in Medicare are anywhere close to "certain,"[23] defendant also neglects to

19. Additionally, as previously noted, in light of the Gagel Declaration, it is far from clear that the HCFA's decision to award the contract to Empire was based on the application of a "tie-breaking" factor after a determination that the overall proposals were essentially equal. *See, supra,* II.A. The reasoning of *Sun Ship* becomes irrelevant and its application to the instant case is eviscerated if the decision were made on the basis stated in the Gagel Declaration, i.e., that the proposals were *technically* equivalent but that Empire's cost proposal was more advantageous to the Government.

20. Defendant also asserts that it was not bound to adhere to the strict letter of the Government procurement rules and regulations and had greater discretion than those rules and regulations permit because HCFA never considered this procurement activity to fall within the dictates of "full and open competition." This argument is specious. Defendant relies on 42 U.S.C. § 1395u(b)(1) which states:

Contracts with carriers under subsection (a) of this section may be entered into without regard to section 5 of Title 41 or any other provision of law requiring competitive bidding. Notwithstanding this provision, HCFA chose to issue a competitive solicitation, advising the offerors that it was "initiating a *competitive process,* under the authority of Section 1842 of the Social Security Act, to select a Medicare contractor to perform system maintenance on the Common Working File (CWF)" (emphasis add-

ed). *See* Administrative Record, Vol. 1, Tab 3. Defendant cites no authority for the proposition that it may inform offerors that a bidding process is competitive and subsequently choose to treat it as non-competitive and ignore the Government procurement rules and regulations. Having elected to initiate a competitive process, the HFCA is bound to evaluate the proposals in accordance with the governing procurement rules and regulations.

21. *See, e.g., Sargent Controls,* Comp.Gen. B–224313.3, Jan. 14, 1988, 88–1 CPD ¶ 32; *Comdisco, Inc.,* 64 Comp.Gen. 11, 84–2 CPD ¶ 416 (Oct. 18, 1984).

22. *See* Plaintiff's Statement of Material Facts Not in Dispute, ¶¶ 18–19, and Defendant's Comments thereto; Defendant's Reply to Plaintiff's Reply in Support of its Motion for Summary Judgment and Opposition to Defendant's Cross–Motion for Summary Judgment, at 10.

23. This argument is itself speculative. As defendant states:

... Medicare is a constantly evolving program. In the next few months, Empire will have to make extensive changes to the CWF system as a result of the Medicare Catastrophic Act of 1988, Pub.L. No. 100–360. There is also a high *probability* that there will be major Part B physician payment reforms, including the *possible* implementation of relative value scales for physician reimbursement. Congressional hearings have been held over the

present any quantifiable savings that will result from the award to Empire. Accordingly, the Court concludes that the HCFA acted in violation of applicable procurement law in applying this speculative factor to award the contract to Empire.

## D. *Relief*

 Because it claims that had the HCFA evaluated the proposals in accordance with the PSR, Maryland's proposal would have been selected, Maryland requests this Court direct the HCFA to award the contract to Maryland. Where it is clear that, but for the unlawful conduct of the contracting officer, the contract would have gone to the unsuccessful bidder, a reviewing court has the authority to award the contract to that bidder. *See Delta Data Systems Corp. v. Webster,* 744 F.2d 197, 204 (D.C.Cir.1984).

The equitable factors which a Court should consider in determining the propriety of such relief include

> whether the contract has already been awarded to another party and, if so, is being performed; the extent an order awarding the contract to the unsuccessful bidder is necessary to vindicate the interest of the public, and competing bidders, in the agency's adherence to the law; and the cost to the government, and hence to the taxpayers, of substituting an unsuccessful bidder for the successful bidder whose price may have been considerably lower.

*Choctaw,* 761 F.2d at 619 (citations omitted).

Our court of appeals has stated that the objective in fashioning a remedy once a violation of procurement law or applicable regulation has been found is "to assure that the government obtains the most advantageous contracts by complying with the procedures which Congress and applicable regulations have provided." *Id.* at 206. "Putting the disappointed bidder in the eco-

nomic position it would have occupied but for the error is normally the best approach to this result." *Id.* at 206–07.

Accordingly, rather than award the contract to Maryland, this Court shall remand this matter to the HCFA for further, *expeditious* consideration and reevaluation of its determination in accordance with this opinion. Among other matters, the HCFA shall have to determine whether it will reissue the PSR to *all* bidders (including those not in the competitive range) and on what criteria it will evaluate the proposals, e.g., will it consider the cost of future CPU usage and if so, of what importance and weight will it be in the evaluation? The HCFA must decide whether it will reconsider its point allocations after affording Maryland an opportunity to revise its bid proposal to take into account all the criteria involved.

In light of the Court's decision to remand this matter to the HCFA for *expeditious* action, and so that the taxpayers are not deprived of an important service, the Court denies Maryland's request that the HCFA's contract with Empire be terminated at this time.

## III. CONCLUSION

For the reasons set forth above, it is hereby

ORDERED that plaintiff's motion for summary judgment is granted and defendant's motion for summary judgment is denied. It is

FURTHER ORDERED that this matter is remanded to the HCFA for further consideration consistent with this opinion.

IT IS SO ORDERED.

---

past several months concerning such reforms. These dramatic changes, *if enacted by Congress as expected,* will also require that Empire make significant modifications to the CWF system.

Defendant's Reply to Plaintiff's Reply in Support of its Motion for Summary Judgment and Opposition to Defendant's Cross–Motion for Summary Judgment, at 10 (emphasis added).