HEALTH SYSTEMS ARCHITECTS, INC.

v.

Donna E. SHALALA, et al.

No. Civ. L–96–2312.

United States District Court,
D. Maryland.

Jan. 30, 1998.

Michael R. Charness, McDermott, Will & Emery, Washington, DC, for plaintiff.

George Russell, III, Assistant United States Attorney, Baltimore, MD, for defendants.

## MEMORANDUM

LEGG, District Judge.

Plaintiff Health Systems Architects, Inc. ("HAS"), marketed a software system, called the Advanced Claims Processing System ("ACPS"), for the processing of Part A Medicare claims. After the Health Care Financing Administration ("HCFA") instructed its national network of claims-processing companies (the "fiscal intermediaries") to use a claims-processing software system other than ACPS, HSA brought suit against HCFA, alleging violations of the Competition in Contracting Act ("CICA") and the Administrative Procedure Act ("APA").

This Court held a bench trial and heard live testimony from several witnesses. It has also reviewed the exhibits admitted at the bench trial, including several depositions and other documents. This opinion constitutes the Court's factual and legal findings pursuant to Fed.R.Civ.P. 52(a). After a careful consideration of the evidence, the Court finds in favor of the government and shall, by separate Order, ENTER JUDGMENT in favor of the government. Fed.R.Civ.P. 58.

## I. Background

### A. How HCFA Processes Medicare Part A Claims

The Health Care Financing Administration ("HCFA") is an arm of the federal Department of Health and Human Services. Under the Social Security Act, 42 U.S.C. §§ 1395 to 1395ccc, HCFA has responsibility for the processing of individual claims for reimbursement of medical expenses under Medicare. Medicare serves essentially in two ways: providing basic hospital and other institutional and home health services by reimbursing claims under "Part A"; and providing reimbursement for medical supplies and additional supplemental services by physicians and other health care professionals under "Part B". (Pl.Exh. 1, Kavanagh Depo. at 17–18.)

HCFA contracts year-to-year with the national umbrella Blue Cross/ Blue Shield Association (the "Blues") for the processing of Medicare Part A claims. (*See* Def.Exh. 1.) The Blues, in turn, subcontract with their state and regional affiliates for claims processing in their respective regions. (*See id.; see, e.g.,* Def.Exh. 4.) These regional Blues are the so-called "fiscal intermediaries," and are the primary claims processors for Medicare Part A claims. (Kavanagh Depo. at 17–21.) At present, there are thirty-six fiscal intermediaries. (9/29/97 Test. Alan John Barton.) HCFA pays the fiscal intermediaries directly for their claims-processing services. (Kavanagh Depo. at 22.)

### B. Claims Processing Software Systems

Under their subcontract agreements, each fiscal intermediary has responsibility for maintaining a computer software system for claims processing. (Kavanagh Depo. at 18–19; Pl.Exh. 17.) Typically, the fiscal intermediaries subcontract with a software provider for the claims processing software. (*See* Def.Exh. 2.) These subcontracts between the fiscal intermediaries and the systems maintainers are renewed on an annual basis, typically renewing in September of each year. (Kavanagh Depo. at 35.) HCFA

ultimately absorbs the cost for the operation of these systems, either through direct funds or through the "base line unit cost" of individual claims.[1] (*See, e.g.,* 9/29/1997 Test. William Michael Brandel; Pl.Exh. 17; Pl.Exh. 2, Earl Depo. at 89; 9/29/1997 Test. Alan John Barton.)

### 1. Development of ACPS, FSS, and Arkansas Systems

As computer technology developed, the fiscal intermediaries subcontracted with many different software providers. In 1980, HSA's predecessor, Policy Management Systems Corporation ("PMSC"), developed a software system it called the Advanced Claims Processing System ("ACPS"), which it marketed to the fiscal intermediaries, beginning with Missouri in 1981. (9/29/97 Test. William Michael Brandel.)

Similarly, some of the fiscal intermediaries developed claims processing software of their own. HCFA's original contract with the Blues specifies that HCFA would obtain "a royalty-free, nonexclusive, and irrevocable license" to any claims processing system that the fiscal intermediaries might develop. (*See* Def.Exhs. 2 & 3, "Index to Plan Subcontract Agreement" at 10–11.) The license would permit HCFA "to use, duplicate or dispose of such data in any manner and for any purpose whatsoever, and to have or permit others to do so." (*Id.*)

In 1990, the Florida Blue Cross provider planned to develop its own claims processing system (the "Florida Software System" or "FSS") and approached HCFA with a proposal for joint funding. Under the agreement, HCFA paid $2,164,891 to develop FSS and, in accordance with its original agreement with the Blues, obtained an irrevocable license in the program. (*See* Def.Exh. 6; Def.Exhs. 2 & 3; 9/29/97 Test. Alan John Barton.) Likewise, the Arkansas Blue Cross provider had entered into a similar agreement with HCFA to develop its own system (the "Arkansas system") many years earlier. (9/29/97 Test. Alan John Barton.)

---

1. The costs include: annual fees for maintenance split among "user groups" of intermediaries that use the same system; and additional funding for "enhancements," "major mandates," and such transition costs as initial installation, training, conversion, and the like.

Although initially the fiscal intermediaries had contracted with many software providers, the number of competing software programs eventually dwindled. In 1989, HCFA announced through a memorandum that it wanted the intermediaries to move into more consolidated maintenance and, if possible, more consolidated processing centers, requiring the consolidation and elimination of many of the competing claims processing software systems. (Kavanagh Depo. at 23–24.) Two primary reasons motivated this policy move: first, HCFA's perception that fewer claims processing systems would reduce transaction costs, helping them to meet budget restraints; and second, a goal of standardization of claims processing, producing greater uniformity throughout the system as a good in itself. (Kavanagh Depo. at 24–25.) By 1994, there were six systems processing part A claims. (Kavanagh Depo. at 26.) By 1995, only three systems remained—ACPS, FSS, and the Arkansas system. (Kavanagh Depo. at 26–27.)

In 1995, seven fiscal intermediaries used ACPS; thirteen fiscal intermediaries used FSS; and twenty-five fiscal intermediaries used the Arkansas system. (Kavanagh Depo. at 32–33.) At that time, the FSS and Arkansas systems were each responsible for roughly 43% of all processed part A claims, while ACPS processed the remaining approximately 14%. (Pl.Exhs. 13 & 18.) In the estimation of HCFA, the Arkansas, FSS, and ACPS systems each performed similarly. (Kavanagh Depo. at 33.)

### 2. HCFA's Consolidation of Software Systems

During the 1990's HCFA also moved forward with its plan to create a single uniform software system capable of processing all Medicare part A and part B claims, a system designated "MTS." In 1992 HCFA issued a Request for Proposals on the MTS project. In 1994, GTE won the contract to design and implement MTS. In February 1996, however, in consultation with GTE, HCFA decided that it would be too risky to move from all of the various existing part A and part B sys-

tems to MTS. Instead, HCFA decided, it would be preferable to make the transition from a single part A system and a single part B system. (Kavanagh Depo. at 42; Earl Depo. at 56.) [2]

### C. Origins of the Current Dispute

In February 1996, the Iowa fiscal intermediary contacted HCFA and asked permission to share a processing site with the Wisconsin intermediary. Both Iowa and Wisconsin used ACPS at the time. However, Iowa and Wisconsin informed HCFA that they wanted to use FSS instead of ACPS at their shared site. (Kavanagh Depo. at 38.) The intermediaries believed that they would experience cost savings from making this transition, and HCFA ultimately would pay less for claims processing as they passed on these operating savings in the "base line unit cost." (Kavanagh Depo. at 39.)

ACPS users at the time processed 21 million claims annually. (Pl.Exh.4.) The Iowa and Wisconsin intermediaries processed 11 million of those claims. (*Id.*) Once Iowa and Wisconsin asked permission to use a different claims processing software, HCFA decided that the time had come to suggest to the remaining users of ACPS that they make the transition to one of the other claims processing software systems.

HCFA made this suggestion for several reasons. At the time, ACPS had smallest number of users. HCFA acting director of program operations Gary Kavanagh noted that "it certainly looked, as you looked into the future . . . that it would seem to make sense just intuitively that the system that had the smallest number of users would probably not be a surviving system." (Kavanagh Depo. at 31.) Moreover, no fiscal intermediary had chosen to move to ACPS from another system during the past several years, including in 1994 when users of three of the six existing part A systems moved to the remaining systems. Of those intermediaries that made the transition, one went to Arkansas and the rest went to Florida; none went to ACPS. (Kavanagh Depo. at 42–43.)

2. Although originally HCFA had believed that MTS would become operational and replace all other software systems by 1997 (9/29/97 Test.

Alan John Barton), after several delays HCFA finally canceled the project in August 1997. (Decl. Bartlett C. Smetana at ¶ 2.)

It was Kavanagh's estimation that once Iowa and Wisconsin moved away from ACPS, it would be unlikely that ACPS would remain economically viable for HCFA to continue to support through its contracts with the fiscal intermediaries. (Kavanagh Depo. at 46–47.)

Kavanagh conducted a telephone conference in March 1996 at which he informed these fiscal intermediaries that HCFA would no longer support ACPS, and asked them to choose either FSS or Arkansas as their future system. Following the conference, the ACPS user group wrote to HCFA informing the agency that the intermediaries in the group would prefer to move to FSS over the Arkansas system. (Kavanagh Depo. at Exh. 5.)

At the same time that HCFA had decided to move the ACPS user group to one of the other software systems, the agency considered achieving its goal of consolidation onto one software system for the entire network of fiscal intermediaries. Following its discussion with the ACPS user group, HCFA contacted the Florida and Arkansas intermediaries to obtain information regarding the two systems; HCFA did not compare or evaluate ACPS when it made this comparison of FSS and the Arkansas system. HCFA compared a variety of aspects of the two systems. (Kavanagh Depo. at 101–11.) Although the nature of this evaluation is a matter of some dispute between the parties, the government considered these requests to be "information requests" rather than a "competition." (Kavanagh Depo. at 125–26.)

Ultimately, HCFA decided that it wanted FSS to be the single part A system that the fiscal intermediaries would use in the interim before the transition to MTS, even though FSS was somewhat more expensive in maintenance and transition than Arkansas, because HCFA thought the functionality of FSS was a better match for the transition to MTS. (Kavanagh Depo. at 110; *see also* Pl. Exh. 7–8.) As it became clear in March 1996 that HCFA would choose between the Arkansas system and FSS for the single part A system from which to transition to MTS, GTE itself recommended that HCFA choose the FSS system. (Letter of George L. Rus-

sell to the Court of 9/30/1997 & attached exhibits.)

Before it would make its final decision, however, HCFA granted a hearing to HSA on March 29, 1996. HSA made a presentation on behalf of the continued viability of ACPS. (Kavanagh Depo. at 85–97; Def.Exh. 7, Jeanette Howard Depo.) At the meeting, Jeanette Howard of HSA explained what features of the ACPS system made it a better system than FSS. (Kavanagh Depo. at 88.) HCFA officials found nothing in the presentation that altered their opinion that they wanted the fiscal intermediaries to use FSS, however, and Gary Kavanagh informed Howard of that fact at the meeting. (Kavanagh Depo. at 94.)

After HCFA announced its decision that FSS would be the single part A system in the interim before MTS, HSA brought the instant suit, alleging that HCFA improperly chose FSS as the single part A system without holding a full and open competition. After the parties began this litigation, HSA agreed to hold an open competition for the installation and maintenance of FSS. In July 1997 HCFA issued a Justification for Other than Full and Open Competition ("JOFOC") for the installation and initial maintenance of the FSS system for the fiscal intermediaries; the JOFOC awards the installation contract to FSS because, at the time, the Florida intermediary was the sole "responsible source" qualified to conduct the installation. (Decl. Pamela K. Collins at ¶ 2 & Attachment 1.) HSA has also declared its intention to issue a Request for Proposals ("RFP") for the ongoing maintenance of the FSS system. (Decl. Pamela K. Collins at ¶¶ 3 & 4; Letter of George Russell to the Court of 9/26/1997 & attached exhibits.) HCFA has continued to contend, however, that it did not need to hold an open competition for its choice of FSS as the claims processing system itself.

**II. Discussion**

HSA claims that HCFA's decision to move the ACPS-using fiscal intermediaries to another system, and to exclude ACPS from its decision-making process in choosing the single part A claims processing system that would operate until MTS, violated the Com-

petition in Contracting Act ("CICA") and the Administrative Procedure Act ("APA"). The Court will address these statutory claims in turn.

## A. CICA

The Court finds that HCFA has complied with the Competition in Contracting Act ("CICA") to the extent that CICA required HCFA's compliance. CICA applies to a government action when "an executive agency [is] conducting a *procurement* for property or services." 41 U.S.C. § 253(a)(1) (emphasis added). If (but only if) the CICA applies, then the agency must "obtain full and open competition through the use of competitive procedures in accordance with the requirements of this subchapter and the Federal Acquisition Regulation." *Id.*

CICA does not define "procurement," but uses "purchases and contracts" in context to mean the same thing. *See* 41 U.S.C. § 252(a). Similarly, The FAR applies to "acquisitions," defined as "the acquiring by contract with appropriated funds of supplies or services...." 48 C.F.R. 2.101 (1996).

 Noting the ambiguity in the statute, courts have defined "procurement" in this context to involve the payment of money or conferral of other benefits to obtain goods or services. For example, in *Rapides Regional Medical Center v. Secretary,* 974 F.2d 565, 573–74 (5th Cir.1992) *cert. denied,* 508 U.S. 939, 113 S.Ct. 2413, 124 L.Ed.2d 636 (1993), the Fifth Circuit explained that "the word procurement is widely understood ... to denote the process by which the government pays money or confers other benefits in order to obtain goods and services from the private sector." *Id.* In contrast, the *Rapides* court squarely rejected the idea that "procurement" as defined in CICA is "all stages of the process of acquiring property or services, beginning with the process of determining a need for property or services." *See Rapides,* 974 F.2d at 573.

Likewise, in *Grigsby Brandford & Co., Inc. v. United States,* 869 F.Supp. 984, 997 (D.D.C.1994), the District Court for the District of Columbia explained that "federal procurement laws and regulations, such as

CICA and the FAR, apply only when an agency ... acts as a commercial purchaser of goods and services.... Hence, CICA applies only to actual government 'procurement' of goods or services." *Id.*

Finally, in *Saratoga Development Corp. v. United States,* 21 F.3d 445 (D.C.Cir.1994), the D.C. Circuit considered a case in which a governmental entity otherwise governed by CICA and the FAR picked a building contractor that it would permit to construct a building in D.C.'s "Federal Triangle." The developer would spend its own money to construct the building and would own the land, but the project contemplated that the federal government would be the building's sole tenant and would amortize the developer's costs of construction through rent over a period of decades. Once the developer had recouped its costs, the government would acquire title to the land (and consequently acquire the building).

In that case, the D.C. Circuit held that the choice of a contractor was not a procurement. The choice of a contractor did not involve an immediate purchase, notwithstanding that the government would ultimately pay for the development through rent. *Saratoga,* 21 F.3d at 452. Accordingly, it held that CICA and the FAR did not apply. Instead, the Court analyzed the plaintiff's claim under the APA.

The reasoning behind these decisions essentially amounts to choosing one model of government action over another. In one model, the government needs to buy something new, such as a pair of gloves. It announces to glove manufacturers that it needs a new pair of gloves and it conducts an open process by which it chooses the manufacturer from whom to buy the gloves.

In a second model, the government already owns two pairs of gloves and keeps them in a closet. When the government goes to the closet to put on a pair of these gloves, it does not need to tell anyone how it chooses between them, nor does it need to conduct an open competition to provide glove manufacturers an opportunity to sell the government a new pair of gloves. Rather, it may simply choose between the gloves it already owns in

whatever rational process it deems appropriate.

In each of the cases cited above, the court had found, in essence, that the government was acting according to the second model—that is, that the government was not buying any new service or good and therefore was not "procuring." Accordingly, these courts found that CICA did not apply to the government action in question.[3]

This second model of government action applies to this case as well. In this case, HCFA did not need to purchase the FSS and Arkansas systems for its use or for the use of the fiscal intermediaries. It had acquired an unlimited, irrevocable license in both software systems through its previous contracts with the Florida and Arkansas Blues. Choosing between these two products did not require the government to agree to any expenditure or exchange; in short, it was not buying anything new.[4] HSA's offer to place ACPS in the public domain would not affect this outcome; if the government were then choosing between three systems for which it had an unlimited, irrevocable license, that decision would also not require the government to buy anything new.[5]

HSA raises two arguments in this regard. First, HSA argues that HCFA voluntarily conducted a "competition" by comparing the FSS and Arkansas systems, thereby making its decision subject to CICA. Second, HSA argues that the choice of contractors to install and to maintain the FSS system in the future is "bundled" with the choice of software system itself, so that the government's subsequent decisions to bid, compete, or justify non-competition for the installation and maintenance was improper.

Upon review of the relevant facts, the Court does not find that HCFA voluntarily conducted a "competition," thereby making it voluntarily subject to CICA for its choice of software systems. Although HCFA certainly can issue a Request for Proposal, as the RFP for the maintenance contract indicates, it did not do so in this case. HCFA contracting officer Alan John Barton testified that HCFA sought background information on the FSS and Arkansas systems, but consciously limited its investigation to avoid holding a full-fledged competition. *Inter alia*, HCFA did not expand its search beyond the FSS and Arkansas systems, nor did HCFA seek the breadth and depth of the information that it would have obtained during a competition. (9/29/97 Test. Alan John Barton.) The Court is satisfied that HCFA did not in fact voluntarily conduct a "competition" between FSS and the Arkansas system that would require it to comply with the "full and open" competition requirements of CICA and FAR.

3. *Blue Cross & Blue Shield of Maryland, Inc. v. United States Department of Health and Human Services*, 718 F.Supp. 80 (D.D.C.1989), is not opposed to this line of precedent. In that case, HCFA had issued a Proposal Submission Requirement and had undisputedly conducted a competition for services; the sole question was whether the competition complied with the necessary requirements.

In this case, HCFA concedes that it did not conduct a competition (*see, e.g.*, Motion in Limine at 2); rather, it contends that it was never required to conduct a competition because it did not "procure" anything in selecting a software system that it already had an unlimited, irrevocable license to use and to distribute. It is this question that the line of cases above address, and that the Court in this case must address.

4. Although the government will procure installation and maintenance services for the system it ultimately chose, HCFA removed those issues from this case by agreeing to compete the installation and maintenance service contracts. *See infra*.

5. The Court does not think it necessary that HCFA had to "own" FSS or the Arkansas system to choose between them; rather, it merely did not have to purchase them. Nevertheless, the issue of the government's "ownership" of the systems generated some confusion during trial. The government's irrevocable, unlimited license in FSS is not absolute "ownership" in the property law, "fee simple absolute" sense. While the government enjoys an unlimited license to use and to distribute the systems, it lacks the right to exclude others from using or from distributing the systems. Private companies may profit from this right to exclude. The right to exclude has no value to the government, however, and indeed would conflict with the government's policy and legal constraints regarding its ownership of intellectual property. Accordingly, the Court finds the government has complete and unfettered rights in the FSS and Arkansas systems, for these purposes equivalent to ownership.

The Court also does not find, having reviewed the facts of the case, that HCFA's choice of software system was a decision inextricably "bundled" with its choice of installer and maintainers. At closing argument, counsel for HCFA divided the services relating to the claims processing software into essentially three categories: (i) the selection of the software itself; (ii) "installation" or "one-time costs," which includes system installation, training, and file conversion; and (iii) "ongoing maintenance" or "task directives," which includes mandates, user groups, and enhancements. HCFA claimed that it addressed the procurement of the "one-time costs" of installation through the JOFOC, and claimed that it addressed the procurement of ongoing maintenance through the RFP.[6]

HSA provides no authority for the proposition that the selection of a software system must necessarily be "bundled" with the contracts for the installation and maintenance of that system. HCFA concedes that the Florida intermediary has a competitive advantage to win the contract to maintain the FSS system under the RFP; indeed, HCFA has already awarded Florida the installation contract through the JOFOC because it was the only contractor truly capable of performing the installation. Florida has this competitive advantage, however, only because the government elected to exercise fully its license to use the Florida system, a course of action it could take in any event.

The trial established that the Florida intermediary's competitive advantage will not be so great as to preclude a fair competition for the maintenance of the installed system. HCFA's witness explained that the agency anticipated that other companies besides the Florida Blue Cross provider would bid upon the maintenance contract. (9/27/1997 Test. Alan John Barton.) HSA's witness, Mr. Brandel, conceded that it is feasible for other

competitors in the industry, including HSA, to compete for the maintenance of FSS; in fact, HSA intends to compete for this contract. (9/27/1997 Test. William Michael Brandel.) Moreover, the testimony established that it is common within the computer industry for firms to compete successfully for contracts to maintain systems developed and installed by a competitor. (*Id.*) Accordingly, the Court finds that the selection of the software system was not inextricably "bundled" with the ancillary installation and maintenance contracts.

HSA does not dispute that the JOFOC for installation and RFP for maintenance of FSS otherwise comply with CICA. This Court has found that HCFA's selection of FSS did not trigger the requirements of CICA. HCFA therefore complies with CICA to the extent that CICA applied.

### B. APA

■ HCFA's decisions leading to the elimination of ACPS as a part A claims processing system also do not violate the Administrative Procedure Act ("APA") The APA provides judicial review for "legal wrong" caused by "final agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." APA, 5 U.S.C. §§ 702, 704, 706(2)(A).[7] As the Supreme Court made clear in *Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 42–43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (discussing administrative rulemaking under this standard), this review is necessarily deferential to the agency:

a reviewing court may not set aside an agency rule that is rational, based on consideration of the relevant factors, and within the scope of the authority delegated to the agency by the statute. . . . The scope of

---

**6.** HSA does not independently dispute the legitimacy either the JOFOC or the RFP; rather, it depends solely upon the argument that these aspects of procurement were impermissibly removed from the initial consideration of the systems.

**7.** This Court granted standing to HSA under the APA in this case on the reasoning of *In the Matter*

of *Optimum Systems, Inc.,* 54 Comp.Gen. 767, 773 (1975). *See* Order of 2/21/1997. HSA submitted in its Proposed Pre-Trial Order, and this Court agrees, that the Court should review this agency action under the APA for "arbitrary and capricious" agency action. *See* Proposed Pre-Trial Order at 8.

review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. [Rather,] the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made." In reviewing that explanation, [a court] must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Normally, an agency rule would be arbitrary and capricious if the agency has ... entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.... [A court will] "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."

*Id.* (citations omitted).

In this case, it was not arbitrary and capricious for HCFA to decide to exclude ACPS from serious consideration as its transition part A claims processing software prior to the transition to MTS.[8] First, ACPS was in use at the least number of claims processing sites and processed the least number of claims, nearly one-third of either of the other alternatives. The costs to transition the other operating sites to ACPS would likely be substantially more than transitioning to one of the other systems.

Second, at the time that HCFA was making its decisions, ACPS was the proprietary software of an outside company, meaning that HCFA would first need to acquire rights in the software. Finally, HCFA had been told that some fiscal intermediaries were interested in moving away from ACPS; no fiscal intermediary had moved to ACPS from another system, and Iowa and Wisconsin, the largest of the ACPS users, had recently decided to move away from ACPS to FSS. All these factors indicate that it was not arbitrary and capricious for HCFA to narrow its

focus to choosing between FSS and Arkansas before ultimately choosing FSS. Accordingly, HCFA's decisions to exclude ACPS from consideration as a part A claims processing system did not violate the APA.

### III. Conclusion

For the reasons stated above, the Court finds that HCFA's actions did not violate either CICA or the APA. The Court finds in favor of the government and shall, by separate Order, ENTER JUDGMENT in favor of the government.

### *ORDER*

For the reasons stated in a Memorandum of even date, the Court GRANTS JUDGMENT in favor of the government and ENTERS JUDGMENT in its behalf. The Clerk is directed to CLOSE this case.

---

8. Although HCFA ultimately terminated MTS, that later decision does not affect the reasoning behind its earlier decision to prepare for the transition to that system.